10-583-cr(L)
*United States v. Coplan*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2011

(Argued: November 14, 2011)                    Decided: November 29, 2012)

UNITED STATES OF AMERICA,

*Appellee,*

v.

ROBERT COPLAN, MARTIN NISSENBAUM,
RICHARD SHAPIRO, BRIAN VAUGHN, CHARLES BOLTON,

*Defendants-Appellants,*

DAVID L. SMITH,

*Defendant.*

Before: KEARSE, MCLAUGHLIN, and CABRANES, *Circuit Judges.*

Defendants Robert Coplan, Martin Nissenbaum, Richard Shapiro, and Brian Vaughn appeal

from judgments of conviction entered on January 28, 2010 in the United States District Court for

the Southern District of New York (Sidney H. Stein, *Judge*), following a 10-week jury trial on charges

of conspiracy to defraud the Government, tax evasion, obstruction of the Internal Revenue Service

("IRS"), and false statements to the IRS. Defendant Charles Bolton appeals from an April 14, 2010

judgment of conviction entered by the District Court following his guilty plea, pursuant to a plea

agreement that contained a limited appeal waiver, to a single conspiracy charge.

We affirm the convictions of Coplan and Vaughn, reverse the convictions of Shapiro and Nissenbaum, and vacate and remand the portion of Bolton's sentence imposing a $3 million fine.

Judge Kearse dissents in part in a separate opinion.

RICHARD C. TARLOWE, Assistant United States Attorney, (Mark Lanpher, Andrea L. Surratt, and Katherine Polk Failla, Assistant United States Attorneys, *on the brief*), *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for Appellee United States of America.*

DENNIS P. RIORDAN, (Donald M. Horgan and Gary Dubcoff, *on the brief*), Riordan & Horgan, San Francisco, CA; Ted Sampsell Jones, William Mitchell College of Law, St. Paul, MN, *for Defendant-Appellant Robert Coplan.*

NATHAN LEWIN, (Alyza D. Lewin, *on the brief*), Lewin & Lewin, LLP, Washington, DC, *for Defendant-Appellant Martin Nissenbaum.*

ALEXANDRA A.E. SHAPIRO, (Marc E. Isserles and James Darrow, *on the brief*), Macht, Shapiro, Arato & Isserles LLP, New York, NY; Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, NY, *of counsel*; *for Defendant-Appellant Richard Shapiro.*

ROBERT G. ANDERSON, (Donna Brown Jacobs, *on the brief*) Butler, Snow, O'Mara, Stevens & Cannada, PLLC, Ridgeland, MS, *for Defendant-Appellant Brian Vaughn.*

MARC N. GARBER, The Garber Law Firm, P.C., Marietta, GA, *for Defendant-Appellant Charles Bolton.*

Joshua L. Dratel, Joshua L. Dratel, P.C., New York, NY, *for amicus curiae* New York Council of Defense Lawyers; Laura Grossfield Birger and Rachel B. Kane, Cooley LLP, New York, NY, *for amicus curiae* National Association of Criminal Defense Lawyers; *in support of Defendants-Appellants.*

2

JOSÉ A. CABRANES, *Circuit Judge*:

We consider here the fate of four partners and employees of Ernst & Young, LLP ("E&Y"), one of the largest accounting firms in the world, who appeal their convictions in connection with the development and defense of five "tax shelters" that were sold or implemented by E&Y between 1999 and 2001. At issue, among other things, is the scope of criminal liability in a conspiracy to defraud the United States under 18 U.S.C. § 371 and the sufficiency of the evidence with respect to the criminal intent of certain defendants.

The defendants in these consolidated actions are three tax attorneys, Robert Coplan, Martin Nissenbaum, and Richard Shapiro, and one accountant, Brian Vaughn, formerly employed by E&Y. A fifth defendant, Charles Bolton, was an investment advisor who owned and operated various asset-management companies.[1] Coplan, Nissenbaum, Shapiro, and Vaughn (jointly, the "trial defendants") appeal from separate judgments of conviction entered by the United States District Court for the Southern District of New York (Sidney H. Stein, *Judge*) on February 17, 2010, following a 10-week jury trial on charges of conspiracy to defraud the Government, tax evasion, obstruction of the Internal Revenue Service ("IRS"), and false statements to the IRS. Bolton appeals from a judgment of conviction entered by the District Court on April 14, 2010, following his plea of guilty to a single conspiracy charge.[2]

For the reasons that follow, we reverse the convictions of Shapiro and Nissenbaum on Counts One, Two, and Three, and the conviction of Nissenbaum on Count Four, and we affirm the convictions of Coplan and Vaughn in their entirety. We affirm the District Court's order sentencing

---

[1] David Smith, the sixth defendant charged in this case, was a fugitive at the time of trial and is not a party to this appeal.

[2] Bolton's plea agreement contained a limited appeal waiver that permitted him to appeal any sentence exceeding six months of imprisonment based on the application of U.S.S.G. § 2T1.9. Because Bolton's sentence exceeded six months of imprisonment and was based on the application of § 2T1.9, his appeal is properly before us.

Bolton principally to 15 months of imprisonment, but we vacate and remand the portion of the judgment that imposed a fine of $3 million.

## BACKGROUND

The evidence underlying the convictions, viewed "in the light most favorable to the prosecution," *Jackson v. Virginia,* 443 U.S. 307, 319 (1979), established the following facts.

## I. Facts

In 1998, E&Y formed a new group tasked with designing tax strategies, or "tax shelters,"[3] to market to "high net worth" individuals who were seeking to shelter at least $20 million from income tax liability.  Originally called the "VIPER" Group (for "Value Ideas Produce Extraordinary Results"), the group was renamed "SISG" (for "Strategic Individual Solutions Group") in 2000. Coplan, Nissenbaum, Shapiro, and Vaughn were the core members of the VIPER Group/SISG. The facts of this case principally relate to the design, implementation, and audit defense of four tax shelters developed by the VIPER Group/SISG: the (1) Contingent Deferred Swap ("CDS"); (2) Currency Options Bring Reward Alternatives ("COBRA"); (3) CDS Add-On ("Add-On"); and (4) Personal Investment Corporation ("PICO") shelters.  Coplan, Nissenbaum, and Shapiro also personally invested in a fifth tax shelter, known as the "E&Y 11 Transaction" or "Tradehill," which was not marketed to E&Y clients.  Although the IRS audited all five tax shelters, only the Add-On shelter was later subject to tax evasion charges.  With respect to the other four tax shelters, the charged conduct principally relates to alleged false or misleading statements made by the defendants

---

[3] As the jury was instructed:

> [T]he term "tax shelter" refers to investments that have the potential for substantial tax savings as one of [their] main benefits.  Some tax shelters are legal; other tax shelters are not, it all depends on the particular facts.

A I: 562–63/490–91.

4

in connection with the IRS audits, as demonstrated by the defendants' internal correspondence, deposition testimony, and written submissions to the IRS.

Since the details of the tax shelters and the supporting tax law are largely irrelevant on appeal, we briefly summarize the (necessarily oversimplified) operation of these transactions as follows.

## A. The CDS Shelter

The CDS shelter was a tax "deferral and conversion" strategy that allowed a taxpayer to convert ordinary income into long-term capital gains and defer tax liability to the year after the income was earned. The taxpayer would form a securities trading partnership in which the taxpayer served as limited partner and another entity served as general partner. The partnership would then engage in a large volume of short-term trading and invest in an 18-month swap transaction. Because of the "trader" status of the partnership, swap payments made by the partnership were deducted as business expenses. If the swap was terminated early (*i.e.* before maturity), but after 12 months, the payments received by the partnership were taxed at the (significantly lower) capital gains rate rather than the ordinary income rate. Treatment of these payments as capital gains depended upon the "early termination" of the swap, which allowed the payment to be characterized as a "termination payment" under the applicable regulations.

## B. The COBRA Shelter

The COBRA shelter was a tax "elimination" strategy that involved creating an asset with a high "basis" for tax purposes, which the taxpayer could then sell and generate a deductible loss. The taxpayer would create a limited liability company ("LLC") that would purchase a pair of offsetting "digital"[4] foreign currency options that involved a bet on how a particular foreign currency would

---

[4] "A 'digital' option—often referred to as an 'all-or-nothing' option—is an option whose payout is fixed as long as the

perform against the U.S. dollar in 30 days. Prior to the maturity of the options, the taxpayer would contribute the option contracts to an investment partnership. After the options expired, the investment partnership was liquidated and the taxpayer's interest in the partnership was transferred to a Subchapter S corporation ("S corporation"),[5] which would sell the assets and realize a deductible tax loss.

## C. The Add-On Shelter

The Add-On shelter was a tax strategy marketed as a means to defer indefinitely income tax liability on capital gains, including the capital gains generated in the second year of the CDS strategy. Like COBRA, Add-On involved the purchase of offsetting digital option pairs, followed by a series of transactions designed to generate a tax loss. The offsetting options were structured so that there was a "one-pip" gap[6] between their strike prices, so that, in a theoretical "home run" scenario, a taxpayer could make a multimillion dollar profit. Unlike CDS and COBRA, however, there was no reasonable possibility of earning a profit from Add-On apart from the "home run" scenario, since the Add-On fee structure required payments to E&Y and the entity acting as general partner that exceeded the potential payoff. As a result, Add-On was the sole tax shelter developed by the defendants that was subject to substantive tax evasion charges.[7]

---

spot price exceeds the strike price; that is, the payout does not increase as the difference between the spot price and the strike price increases." Gov't's Br. 33-34 n.**.

[5] A Subchapter S corporation is a corporation that makes a valid election to be taxed under Subchapter S of the Internal Revenue Code. *See* 26 U.S.C. §§ 1361–1379. "Subchapter S allows shareholders of qualified corporations to elect a 'pass-through' taxation system under which income is subjected to only one level of taxation. The corporation's profits pass through directly to its shareholders on a pro rata basis and are reported on the shareholders' individual tax returns." *Gitlitz v. C.I.R.*, 531 U.S. 206, 209 (2001) (internal citations omitted).

[6] A "one-pip" gap is the smallest possible "spread" in an option pair.

[7] *See* A III: 567/5548 (Government's summation) ("Now, Counts Two and Three of the indictment charge all four defendants with tax evasion, but only with respect to the Add-on transaction, and that's why I have emphasized that the other shelters are not charged as tax evasion.").

## D.  The PICO Shelter

The PICO shelter was a tax deferral and conversion strategy that involved an investment in an S corporation with another shareholder.  The taxpayer would purchase 20% of the stock of the S corporation, while another person associated with the Bricolage investment firm (which helped to implement the transaction) would purchase the remaining 80% interest.  The S corporation (also known as the Personal Investment Corporation, or "PICO") would then purchase so-called "straddles," financial instruments that generated offsetting gains and losses on foreign currencies, interest rates, or commodities.  After building up a sufficient inventory of "losing" bets, the PICO would buy out the 80% shareholder.  Under a tax regulation, the 80% shareholder would be allocated his share of the gains recognized by the PICO up to the time of redemption, and all the gains and losses recognized thereafter (*i.e.* most of the losses) would be allocated to the taxpayer.  After contributing additional assets to the PICO, the taxpayer could then take the desired deduction.

## E.  The Tradehill Shelter

Unlike the other four tax shelters, the Tradehill shelter was marketed only to E&Y partners.  After E&Y sold the consulting arm of its business to a French company called Cap Gemini in 2000, each E&Y partner received an allocation of Cap Gemini stock.  Eleven E&Y partners participated in Tradehill, which was designed to eliminate the tax due on the income they recognized from the Cap Gemini transaction.  Like COBRA and Add-On, Tradehill involved the formation of numerous corporate entities and the contribution of option pairs from one entity to another.

We note that similar tax shelters were marketed and sold by other major accounting firms and law firms as part of a lucrative "tax avoidance" practice that flourished in the late 1990s.[8]  *See*

---

[8] Indeed, the record in this case supports an inference that E&Y was not the first to implement the types of tax shelters at issue.  *See, e.g.*, A IV: 114 (internal e-mail noting that "seven major law firms, AA [Arthur Anderson], and KPMG are

*generally The Role of Professional Firms in the U.S. Tax Shelter Industry*, S. Rep. No. 109-54, at 3 (2005). In February 2000, the IRS created the Office of Tax Shelter Analysis and subsequently issued a series of notices directed at "abusive" tax shelters.[9] An April 2005 report issued by the Permanent Subcommittee on Investigations of the Senate Committee on Homeland Security and Governmental Affairs stated that "[u]nder current law, no single standard defines an abusive tax shelter." *Id.* The report further noted that "[o]ver the past 10 years, Federal statutes and regulations prohibiting illegal tax shelters have undergone repeated revision to clarify and strengthen them." *Id.* Although this case does not require us to comment on the substance of those revisions, we think it useful to acknowledge that the law with respect to tax shelters has evolved since E&Y formed the VIPER Group in 1998.

## II. Procedural History

A federal grand jury returned a sealed indictment on May 22, 2007, and a superseding indictment on February 19, 2008, charging the defendants in thirteen counts with a wide-ranging conspiracy to defraud the United States through the development, sale, and implementation of the E&Y tax shelters. The superseding indictment was redacted to seven counts (the "Redacted Indictment") for the trial of Coplan, Nissenbaum, Shapiro, and Vaughn.[10]

---

selling the short option strategy"); A II: 92/1086 (client inquiry about whether E&Y offered a tax elimination strategy similar to that presented by another consulting group).

[9] *See* Partnership—Audit Technique Guide, ch. 9, *available at* http://www.irs.gov/Businesses/Partnerships/Partnership---Audit-Technique-Guide---Chapter-9---Tax-Shelters---The-Disclosure-Regime-(Revised-12-2007) (last visited Nov. 26, 2012).

[10] See Appendix A for an overview of the Redacted Indictment and Information. As noted above, David Smith was also charged in the Superseding Indictment, but was a fugitive at the time of trial.

Count One of the Redacted Indictment charged each trial defendant with a conspiracy, in violation of 18 U.S.C. § 371,[11] with three objectives: (1) to defraud the United States by impairing the lawful governmental functions of the IRS (known as a "*Klein* conspiracy," *see United States v. Klein*, 247 F.2d 908, 915 (2d Cir. 1957)); (2) to commit tax evasion in connection with the Add-On tax shelter, in violation of 26 U.S.C. § 7201;[12] and (3) to make false statements to the IRS, in violation of 18 U.S.C. § 1001.[13]

Counts Two and Three charged each trial defendant with tax evasion, in violation of 26 U.S.C. § 7201, in connection with the Add-On tax shelter.

Counts Four and Five charged Nissenbaum and Coplan, respectively, with obstructing the IRS, in violation of 26 U.S.C. § 7212.[14]

---

[11] Section 371 provides, in relevant part, that "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 371.

[12] Section 7201 provides, in relevant part, that "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony." 26 U.S.C. § 7201.

[13] 18 U.S.C. § 1001(a) provides, in relevant part:

> (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
>
> > (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> > (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> > (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
>
> shall be fined under this title, imprisoned not more than 5 years . . . or both.

18 U.S.C. § 1001(a).

[14] Section 7212(a) provides, in relevant part, that "[w]hoever corruptly or by force or threats of force . . . obstructs or impedes, or endeavors to obstruct or impede, the due administration of this title, shall, upon conviction thereof, be fined not more than $5,000, or imprisoned not more than 3 years, or both." 26 U.S.C. § 7212(a).

Counts Six and Seven charged Vaughn and Coplan, respectively, with making false statements to the IRS, in violation of 18 U.S.C. § 1001.

Trial commenced on March 3, 2009, with the beginning of jury selection. At trial, the Government sought to demonstrate that the defendants conspired to conceal the true nature of the five tax shelters by creating a variety of "cover stories" regarding the purported business purpose of the shelters, when in fact the shelters were motivated solely by a desire to avoid taxes.[15] In essence, the Government sought to demonstrate that the defendants hid the truth from the IRS by withholding information and making affirmative misstatements. On May 7, 2009, the jury returned a general verdict of guilty on all counts. On January 21 and 22, 2010, the District Court sentenced the trial defendants principally as follows: Coplan was sentenced to 36 months of imprisonment, three years of supervised release, and a $75,000 fine; Nissenbaum was sentenced to 30 months of imprisonment, three years of supervised release, and a $100,000 fine; Shapiro was sentenced to 28 months of imprisonment, two years of supervised release, and a $100,000 fine; and Vaughn was sentenced to 20 months of imprisonment and two years of supervised release. The judgments of conviction for the trial defendants were entered on January 28, 2010.

Prior to trial, on January 22, 2009, Bolton pleaded guilty to a Superseding Information charging him with a single count of conspiracy, in violation of 18 U.S.C. § 371, having three objectives: (1) to defraud the United States by impeding, impairing, defeating, and obstructing the lawful governmental functions of the IRS (the so-called "*Klein* conspiracy"); (2) to make false statements to the IRS, in violation of 18 U.S.C. § 1001; and (3) to corruptly obstruct and impede the administration of the internal revenue laws, in violation of 26 U.S.C. § 7212(a). On April 14, 2010,

---

[15] The IRS can disallow deductions resulting from a transaction that "can not [sic] with reason be said to have purpose, substance, or utility apart from [its] anticipated tax consequences. Such transactions are said to lack 'economic substance.'" *Lee v. Comm'r*, 155 F.3d 584, 586 (2d Cir. 1998) (internal quotation marks and citations omitted).

the District Court entered a judgment of conviction sentencing Bolton principally to 15 months of imprisonment and a $3 million fine.

The defendants have remained free on bail pending the resolution of this appeal.

## DISCUSSION

The defendants raise no fewer than ten challenges to their respective convictions and sentences on appeal, which we briefly summarize as follows: (1) the Government's *Klein* conspiracy theory was legally invalid, (2) there was insufficient evidence to support (a) the convictions of Shapiro and Nissenbaum on Count One, the conspiracy charge, (b) the convictions of Shapiro and Nissenbaum on Counts Two and Three, the tax evasion charges, and (c) Nissenbaum's conviction on Count Four, the obstruction charge, (3) the District Court erred in finding that venue was proper for Count Six, which charged Vaughn with false statements to the IRS, (4) the District Court erred by admitting the testimony of alleged coconspirator Graham Taylor, a tax attorney who committed a variety of crimes involving tax shelters unrelated to this case, (5) the District Court erred in admitting the out-of-court statements of more than 20 alleged coconspirators, (6) the District Court erred in excluding portions of Coplan's and Vaughn's deposition transcripts, (7) the defendants were prejudiced by prosecutorial misconduct in the Government's rebuttal summation, (8) the District Court erred in (a) declining to give a "theory of the defense" instruction, (b) instructing the jury on a conscious avoidance theory; and (c) instructing the jury that "economic substance" existed only if there was a "reasonable possibility" of profit, (9) spillover prejudice infected Coplan's and Vaughn's remaining convictions, and (10) Bolton's sentence was procedurally and substantively unreasonable.

11

## I. Validity of the Government's *Klein* Conspiracy Theory

The first issue on appeal concerns the legal validity of the Government's *Klein* conspiracy theory under the "defraud clause" of 18 U.S.C. § 371.[16]  As previously noted, Count One of the Redacted Indictment charged Coplan, Nissenbaum, Shapiro, and Vaughn in a § 371 conspiracy with three objectives: (1) to defraud the United States (the *Klein* conspiracy), (2) to evade taxes, and (3) to make false statements to the IRS.  The core objective argued by the Government at trial was the *Klein* conspiracy, and that conspiracy forms the primary focus of the defendants' arguments on appeal.

### A. The Origins of the *Klein* Conspiracy

Enacted in 1867, the original federal conspiracy statute was appended to "An Act to amend existing Laws relating to Internal Revenue and for other Purposes."  Abraham S. Goldstein, *Conspiracy to Defraud the United States*, 68 Yale L.J. 405, 418 (1959) (quoting Act of March 2, 1867, ch. 169, § 30, 14 Stat. 484).  In the 1875 codification, the statute was moved from its place among the internal revenue measures and included among the general penal provisions.  *Id.* at 418 n.36.  In *United States v. Hirsch*, 100 U.S. 33 (1879), the Supreme Court held that the conspiracy provision was generally applicable to the whole body of federal law.  In so holding, the Court described the prohibited fraud as "any fraud against [the United States].  It may be against the coin, or consist in cheating the government of its land or other property."  *Id.* at 35.

"It is a well-established rule of construction that where Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."

---

[16] Section 371 prohibits all conspiracies either "to commit any offense against the United States" (the "offense clause"), or "to defraud the United States, or any agency thereof in any manner or for any purpose" (the "defraud clause").  18 U.S.C. § 371.

*Neder v. United Stat*es, 527 U.S. 1, 21 (1999) (internal quotation marks and alterations omitted) (omission in the original). At common law, the words "to defraud" meant to deprive another of property rights by dishonest means.[17] *See Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924); *Porcelli v. United States*, 303 F.3d 452, 457 n.1 (2d Cir. 2002) (noting that the "familiar common law meaning" of the term "'fraud'" involved "using falsity to do the victim out of money or property interests"). Other federal criminal statutes are generally in accord. *See, e.g.*, *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) ("In the context of mail fraud and wire fraud, the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes' . . . ." (quotation marks omitted)).

Nonetheless, the word "defraud" in § 371 has been interpreted much more broadly. The current understanding of "conspiracy to defraud" liability may be traced to two seminal Supreme Court cases. In the first case, *Haas v. Henkel*, 216 U.S. 462 (1910), the defendants obtained advance information from a statistician employed by the Department of Agriculture in order to gain a speculating advantage in the grain futures market. The Court invoked an expansive reading of the word "defraud" to bring the defendants' conduct within the conspiracy statute. Specifically, the Court held that "it is not essential that such a conspiracy shall contemplate a financial loss or that one shall result. The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." *Id.* at 479.

---

[17] In the authoritative dictionary of the day, "defraud" was defined as "[t]o deprive of right by fraud, deception or artifice." *The American Dictionary of the English Language* 347 (1864). "Fraud" was defined as "[d]eception deliberately practiced with a view to gaining an unlawful or unfair advantage; artifice by which the right or interest of another is injured; injurious stratagem; deceit; trick." *Id.* at 541. The *American Dictionary of the English Language*, published by Noah Webster in 1864, is, of course, not to be confused with the *American Heritage Dictionary of the English Language*, published by Houghton Mifflin in 1969, or any modern dictionary bearing the surname of the great American lexicographer.

Fourteen years later, in *Hammerschmidt v. United States*, 265 U.S. 182 (1924), the Court attempted to retrench from the expansive reading of § 371 in *Haas*. In the words of Professor (later, Dean) Abraham S. Goldstein of the Yale Law School, "[t]he expansive reading of the statute in *Haas* . . . finally led the Supreme Court to attempt a systematic examination of what the judiciary had wrought. *Hammerschmidt v. United States* furnished the occasion." Goldstein, 68 Yale L.J. at 429 (footnote omitted). The *Hammerschmidt* defendants were convicted of a conspiracy to defraud the United States by interfering with the World War I military draft through the printing and circulation of handbills urging those subject to the draft not to obey it. The Supreme Court reversed the convictions under § 371, holding that "[t]o conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions *by deceit, craft or trickery, or at least by means that are dishonest.*" *Hammerschmidt*, 265 U.S. at 188 (emphasis added). Because the defendants' "open defiance" of the Selective Service Act was devoid of deceit or other trickery, the Supreme Court held that their conduct did not fall within the scope of § 371. *Id.* at 189.

The *Klein* conspiracy doctrine at issue here is the progeny of *Haas* and *Hammerschmidt*.[18] In *United States v. Klein*, 247 F.2d 908, 916 (2d Cir. 1957), the defendants were charged with tax evasion and a "defraud conspiracy" in connection with their whiskey selling business. *Id.* at 915–16. The district court entered judgments of acquittal on the substantive counts, and the jury convicted on the remaining § 371 conspiracy count. On appeal, we found sufficient evidence to support the § 371 conspiracy conviction based on twenty "acts of concealment of income," including false statements on tax returns and in interrogatory responses. *Id.* at 915. Relying on *Hammerschmidt*, we held that

---

[18] Indeed, the appellation "*Klein* conspiracy" is in some sense a misnomer, since the primary holding of *Klein* is a quotation from *Hammerschmidt*.

> [m]ere failure to disclose income would not be sufficient to show the crime charged of defrauding the United States under 18 U.S.C. § 371. The statute, however, not only includes the cheating of the government out of property or money, but "also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest."

*Id.* at 916 (quoting *Hammerschmidt*, 265 U.S. at 188). Thus, in order to prove a *Klein* conspiracy, the Government must show "(1) that [the] defendant entered into an agreement (2) to obstruct a lawful function of the Government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy." *United States v. Ballistrea*, 101 F.3d 827, 832 (2d Cir. 1996) (alteration omitted).

### B. The Challenge to *Klein*

The defendants argue vigorously on appeal that the *Klein* conspiracy theory is textually unfounded. The Government's *stare decisis* defense of the *Klein* doctrine lends support to this view, as it rests entirely on the construction of § 371 in *Hammerschmidt*. There is nothing in the Government's brief recognizable as statutory interpretation—no discussion of plain meaning, legislative history, or interpretive canons. Indeed, in all 325 pages of its brief, the Government does not even quote the text of § 371. The Government thus appears implicitly to concede that the *Klein* conspiracy is a common law crime, created by the courts rather than by Congress. That fact alone warrants considerable judicial skepticism. *See United States v. Lanier*, 520 U.S. 259, 267 n.6 (1997) ("Federal crimes are defined by Congress, not the courts . . . ."); *see also Rogers v. Tennessee*, 532 U.S. 451, 476 (2001) (Scalia, J., dissenting) ("[T]he notion of a common-law crime is utterly anathema today . . . .").

To justify an expansive reading of § 371, courts have occasionally implied that a conspiracy to defraud the *Government* is to be read more broadly than a conspiracy to defraud a private person. *See* Goldstein, 68 Yale L.J. at 424. Dicta in *McNally v. United States*, 483 U.S. 350 (1987), for example,

15

accepted such a distinction. Quoting a decision of the Court of Appeals for the First Circuit, the Supreme Court stated that "'[a] statute which . . . has for its object the protection of the individual property rights of the members of the civic body, is one thing; a statute which has for its object the protection and welfare of the government alone, which exists for the purpose of administering itself in the interests of the public, [is] quite another.'" *Id.* at 359 n.8 (quoting *Curley v. United States*, 130 F. 1, 7 (1st Cir. 1904) (alterations in original)). But this conclusion appears to rest on a policy judgment—that, in the nature of things, government interests justify broader protection that the interests of private parties—rather than on any principle of statutory interpretation.

Notwithstanding these infirmities in the history and deployment of the statute, it is now well established that § 371 "is not confined to fraud as that term has been defined in the common law," but reaches "'any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government.'" *Dennis v. United States*, 384 U.S. 855, 861 (1966) (quoting *Haas*, 216 U.S. at 479). Indeed, Coplan (whose counsel "takes the laboring oar" on the *Klein* conspiracy issue) "readily concedes that, were the weight of this Circuit's case law outcome-determinative in this matter, his challenge to the government's *Klein* theory would fail." Coplan Reply 3.

Although the defendants argue forcefully on appeal that we should follow the example of *Skilling v. United States*, 130 S. Ct. 2896, 2928 (2010), and "pare" the body of § 371 precedent "down to its core," *id.*, such arguments are properly directed to a higher authority. As an intermediate appellate court, we are bound to follow the dictates of Supreme Court precedents, no matter how persuasive we find the arguments for breaking loose from the moorings of established judicial norms by "paring" a statute.

16

In sum, because the *Klein* doctrine derives from and falls within the scope of the law of the Circuit (itself grounded on long-lived Supreme Court decisions), we reject the defendants' challenge to the validity of that theory of criminal liability.

## II. The Sufficiency Challenges

In addition to challenging the legal validity of the *Klein* conspiracy theory, defendants Shapiro and Nissenbaum mount a series of sufficiency challenges.[19]  As a general matter, a defendant challenging the sufficiency of the evidence that led to his conviction at trial "bears a heavy burden," *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (quotation marks omitted), as the standard of review is "exceedingly deferential," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008).  In evaluating a sufficiency challenge, we "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008) (internal citations, alterations and quotation marks omitted)).  Although sufficiency review is *de novo*, *United States v. Yannotti*, 541 F.3d 112, 120 (2d Cir. 2008), we will uphold the judgments of conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson*, 443 U.S. at 319.

## A.  Sufficiency of the Evidence Supporting Count One

Defendants Shapiro and Nissenbaum first challenge the sufficiency of the evidence with respect to each of the three alleged objectives of the § 371 conspiracy.  As previously noted, Count One of the Redacted Indictment charged the trial defendants in a § 371 conspiracy with three

---

[19] Vaughn joins in Shapiro's argument regarding the insufficiency of the evidence to prove a *Klein* conspiracy, but raises no specific sufficiency challenges of his own.  Coplan does not raise a sufficiency challenge.

objectives: (1) to defraud the United States (the *Klein* conspiracy); (2) to evade taxes, in violation of 26 U.S.C. § 7201; and (3) to make false statements to the IRS, in violation of 18 U.S.C. § 1001.

"To sustain a conspiracy conviction, the Government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004) (quotation marks omitted). In the context of a conspiracy conviction, "deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court." *United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010) (quotation marks omitted) (alteration in original). Where, as here, "a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Griffin v. United States*, 502 U.S. 46, 56–57 (1991) (quotation marks omitted). For that reason, "the lack of sufficient evidence to support one of the objects of a multi-object conspiracy [will] not vitiate the conspiracy conviction, where there [i]s sufficient evidence to support [another] object." *United States v. Pascarella*, 84 F.3d 61, 71 (2d Cir. 1996).

In what follows, we consider the conspiracy evidence against defendants Shapiro and Nissenbaum, mindful that "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole," *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (quotation marks omitted). Nevertheless, for the sake of clarity and ease of analysis, we examine the evidence with respect to each alleged objective of the conspiracy in some detail before considering the conspiracy "as a whole." For the

18

reasons that follow, we conclude that the evidence with respect to the intent of Shapiro and Nissenbaum is insufficient to support their convictions on Count One.

### 1. Conspiracy Evidence Against Shapiro

#### i. *Klein* Conspiracy Objective

The centerpiece of the conspiracy case against Shapiro, an E&Y partner and tax lawyer with nearly four decades' experience, is the Government's claim that he "coached" E&Y partner Thomas Dougherty to lie to the IRS by helping him come up with non-tax explanations for the COBRA transaction that Shapiro knew were not true. In rebuttal summation, the Government argued that "[i]f you credit Mr. Dougherty's testimony, . . . that alone is proof beyond a reasonable doubt on the conspiracy count at least as to . . . Mr. Shapiro." On appeal, the Government similarly argues that Dougherty's testimony "standing alone . . . would be sufficient to support his conviction on the false statements object of the conspiracy." Indeed, variations on the assertion that Shapiro "coached" Dougherty to lie appear no fewer than four times in the Government's brief. *See* Gov't's Br. 67, 112, 117, 134.

But the record with respect to Dougherty's testimony is considerably more equivocal than in the Government's account.

*April 2, 2001 Conference Call.* Dougherty testified that in March 2001, he advised Coplan that the IRS was auditing the WRB Lake transaction[20]—the first such audit of a COBRA transaction. In response, Coplan informed Dougherty that Dennis Conlon, an attorney in E&Y's national tax practice, would coordinate the audit response. On April 2, 2001, Dougherty participated in a conference call with Coplan and Conlon that involved a discussion of "ideas that may be presented

---

[20] The "WRB Lake" transaction was a COBRA transaction named for the three business partners who executed the shelter with the assistance of Dougherty.

to the agent for why [the clients] did the steps that they did" in executing the COBRA transaction. Following the initial conference call, Conlon sent an e-mail indicating that, "I think we need Richard [Shapiro] at the first meeting," because "I want to state our case clearly and correctly from the beginning."

*April 24, 2001 Conference Call.* On April 24, 2001, Dougherty participated in a conference call with Conlon, Coplan, and Shapiro. According to Dougherty's contemporaneous notes, Shapiro raised the topic of the business purpose of the COBRA transaction during the call.

*May 16, 2001 Preparation Meeting.* Dougherty testified that on May 16, 2001, "Conlon led [a] meeting to prepare Richard Shapiro and myself for our meeting the next day with the IRS." At that meeting, Conlon coordinated the assignment of discussion topics for the IRS meeting, reviewed the relevant points of the IRS Information Document Request ("IDR"), and "anticipated . . . questions that would come up during the IRS meeting."

*May 17, 2001 IRS Meeting.* The following day, Conlon, Dougherty, and Shapiro met with the IRS to discuss the WRB Lake COBRA transaction. During that meeting, Dougherty falsely represented that E&Y "mentioned the tax and financial implications of foreign currency investments" to the clients involved in the WRB Lake transaction, and that the clients "became interested" in the COBRA transaction as a result. Dougherty testified at trial that in fact his discussion of foreign currency investment with the clients was "strictly limited to discussions we had in the presentation of the COBRA transaction," and that he had "lied [to the IRS agents] about the reasons for [the clients] entering into the COBRA transaction." Although Dougherty testified that he had told Shapiro "the real facts" about how the WRB clients "had come to Ernst & Young for the COBRA transaction," he did not elaborate on the substance of that conversation.

20

On these facts, the Government repeatedly asserts that "Dougherty testified specifically that in consultation with Coplan and Shapiro, he lied to the IRS," and that "Coplan and Shapiro coached Dougherty to provide false information to the IRS." But the record support for these assertions is slim at best. With respect to the April 24, 2001 conference call, Dougherty's notes indicate that Shapiro asked a single question: "What is the business purpose?" During the May 16, 2001 preparation meeting, Conlon—not Shapiro—led the meeting, reviewed the IDR, anticipated potential IRS questions, and coordinated "who [would] . . . talk about what topics" at the meeting. Contrary to the Government's assertion, Dougherty testified on cross-examination that Shapiro "never told [him] to lie" and did not suggest lying to the IRS in order to conceal "problems" with the COBRA transaction. Crucially, Dougherty further testified that Shapiro himself "believed [COBRA] worked under the law."

Beyond the Dougherty testimony, the Government also claims that Shapiro engaged in various acts that, while not "inherently deceptive," were deceptive "in the context of this case," as follows.

*Promotional Materials.* The Government faults Shapiro for his participation in E&Y's policy of discouraging personnel from leaving PowerPoint slides and other marketing materials with clients, in case the IRS should demand copies of those materials from the client during an audit. *See, e.g.*, A V: 42 (Shapiro e-mail stating that presentation materials should not be left with the client). The Government claims that Shapiro and others enforced this policy to prevent the marketing materials, which laid out each step of the underlying transactions, from falling into the hands of the IRS. The Government does not argue, however, that the IRS ever requested copies of the

21

promotional materials held in E&Y's own files, or that governing ethical standards required E&Y to disclose those materials in the absence of such a request.[21]

*Early Termination.* Similarly, the Government highlights Shapiro's editorial comments on an internal "Action Plan" that summarized the steps involved in the CDS tax shelter. Shapiro advised his E&Y colleagues to avoid references to the "early" termination of the CDS swap contracts.[22] The Government characterizes Shapiro's advice as an "underhanded effort[] to protect the descriptions of CDS that were designed to convince the agents of something the defendants knew to be false." Gov't's Br. 122 (internal quotation marks omitted). As the Government reluctantly concedes, however, the CDS swap contracts provided that *either* party could *elect* to terminate the swap before the maturity date—but imposed no obligation to do so. Indeed, several clients inquired about continuing the swaps to the maturity date because they were "interested in the swap profits," and were told that doing so would lead to deferral of income, but not conversion from ordinary to capital gain. In the end, no CDS swap extended past the early termination date. Although Shapiro's edits to the CDS "Action Plan" clearly deemphasized the prevailing expectation of early termination, it appears that the revised version was in fact *more accurate* in its summary of the swap contract terms.

*Advice to Keep CDS Trading Account Open.* As an additional example of deception "in context," the Government points to a suggestion by Coplan, Shapiro, and Nissenbaum that CDS clients continue trading past the early termination date in order to "mak[e] their tax argument as strong as possible." A IV: 214; *see id.* at 212 (Shapiro e-mail advocating "keeping the trading account active" in light of the "upside and no down side"); *id.* at 219. The Government argues that this

---

[21] *Cf.* ABA Model Rules of Prof'l Conduct, pmbl. ¶ 9 (2006) (reaffirming basic principle of "the lawyer's obligation zealously to protect and pursue a client's legitimate interests, within the bounds of the law").

[22] In the original draft of the CDS Action Plan, Step 45 read as follows: "At the appropriate time during the swap period, GP will terminate the swaps with the bank." In response to Shapiro's advice, Step 45 was edited to read, "Swap terminates."

advice "was designed to protect the bogus descriptions of CDS." Gov't's Br. 122. There is no dispute, however, that the substance of the advice advocated lawful trading activity.

*Review of PICO Documents.* Finally, the Government points to Shapiro's development and review of various documents related to the PICO tax shelter as evidence of his "involvement in providing false information directly to the IRS." Gov't's Br. 135. For example, the Government highlights Shapiro's involvement in drafting the PICO opinion letter with outside counsel, Peter Cinquegrani, who was then special counsel at Arnold & Porter. The Government argues, *inter alia*, that the opinion letter contained misleading statements because it described PICO as an "opportunity to create personal investment companies," A V: 504, when the "real reason" for the transaction "was to provide tax losses for investors," A III: 114/3756. Cinquegrani, the self-described "principal wordsmith" of the opinion letter, testified at trial that he intended the opinion letter to be misleading because his "intention was to describe the transaction as much as possible as an ordinary business deal and to downplay all the tax aspects." There is little such evidence with respect to Shapiro's intent. The record of communication between Cinquegrani and Shapiro reflects a sometimes tense working relationship, in which Shapiro repeatedly raised questions and concerns about the language of the draft opinion. *See* A III: 144/3873–145/3876 (Cinquegrani testimony describing Shapiro as "a pain" and "high maintenance" because he "would frequently ask the same questions multiple times" and "would revisit the same issues that had previously been addressed"). For example, Shapiro expressed "concern" that "the nature of the rep[resentation]s investors are making . . . may be too strong." A IV: 455. On several occasions, Shapiro proposed revisions that Cinquegrani incorporated into PICO documents. As a result, an early representation that PICO clients had a "principal" investment purpose was replaced by a representation that PICO clients had a "substantial nontax business purpose." A III: 165/ 3955–56. Shapiro also questioned a draft

23

version of the opinion letter that inaccurately suggested that the tax consequences of the PICO transaction were not discussed with clients. A IV: 457. As a result, the final opinion letter disclosed that potential PICO investors were "provided an overview of the economics of the trading strategy, including potential tax consequences." A V: 575.

The Government argues strenuously on appeal that the final opinion letter still contained lies and misleading statements about the "real reason" for the PICO transaction. But we note that, as Cinquegrani himself testified, the *very fact* that an opinion letter was prepared indicates that the client anticipated substantial tax benefits from the transaction. A III: 146/3880–81. Thus, to fault Shapiro because the opinion letter failed affirmatively to state that the "real reason" for the PICO transaction was "to provide tax losses" borders on the spurious. At a minimum, Shapiro's conduct with respect to the crafting of the PICO opinion letter appears equally consistent with good faith in his role as a "technician" tasked with making sure the transactions were structured in compliance with tax law. A III: 140/3857–58 (Cinquegrani testimony); *see also* A II: 544–45/2865–67 (Six testimony); A III: 398/4882 (Rydberg testimony).[23]

### ii. Tax Evasion Objective

Shapiro also challenges the sufficiency of the evidence with respect to the tax evasion objective of the § 371 conspiracy charged in Count One. "It is elementary that conspiracy is a crime, separate and distinct from the substantive offense." *United States v. Pinckney*, 85 F.3d 4, 8 (2d Cir. 1996). "Although the government need not prove commission of the substantive offense" to secure a conspiracy conviction, "it must prove that the intended future conduct [the conspirators] agreed upon includes all the elements of the substantive crime." *Id.* (internal quotation marks and

---

[23] For the sake of convenience and to avoid undue repetition, we set forth the evidence with respect to Shapiro's involvement in the Add-On tax shelter under the rubric of the tax evasion objective below. Our analysis of that evidence is, of course, equally applicable in connection with the *Klein* conspiracy objective.

24

alterations omitted). In this case, the substantive crime of tax evasion requires proof of "(1) the existence of a substantial tax debt, (2) willfulness of the nonpayment, and (3) an affirmative act by the defendant, performed with intent to evade or defeat the calculation or payment of the tax." *United States v. Litwok*, 678 F.3d 208, 215 (2d Cir. 2012) (quotation marks omitted); *see* 26 U.S.C. § 7201.

The Government's sole tax deficiency theory at trial was that the Add-On tax shelter offered investors no reasonable possibility of profit, and that the tax losses resulting from Add-On therefore could not properly be deducted from the investors' tax returns. The Government argued that, in order to create a non-tax explanation for the mechanics of the Add-On transaction, the trial defendants adopted a false "cover story" proposed by Bolton. That cover story attributed a key step in the Add-On transaction—the transfer of digital options from the individual partnership to a newly formed LLC—to a request from trader Andrew Krieger to consolidate accounts for administrative convenience. There was no meaningful dispute at trial that the "consolidation cover story" was false.

The Government argues that sufficient evidence supported the tax evasion objective because Shapiro "w[as] involved at critical junctures of Add-On's development, marketing, and defense." In what follows, we consider the evidence with respect to Shapiro's involvement at each of these "critical junctures."

*Add-On Development.* The parties do not dispute that the strategy for the Add-On tax shelter was initially proposed by Vaughn and thereafter developed by Vaughn, Coplan, and members of the investment firm operated by Bolton. Although Shapiro received copies of early e-mails describing a "precursor concept" to the Add-On shelter, and participated in telephone conferences about that preliminary idea, the "specifics" of the transaction were only developed subsequently. A III:

25

237/4241; *see* A II: 496/2674 (this was "not the way the Add-On transaction ultimately came to be"). Moreover, Shapiro did not attend an early meeting at which the alleged "cover story" was discussed, was not involved in drafting the factual section of the Add-On legal opinion letter, and was excluded from e-mails in which others discussed the economics of the transaction.

*Add-On Marketing.* The Government's claim that Shapiro was involved in marketing the Add-On shelter rests primarily on his receipt of various e-mails. In June 2000, Coplan sent Vaughn, Shapiro, and Nissenbaum a proposed e-mail to other E&Y professionals announcing the new Add-On shelter, and asked them to review for "accuracy and tone." A IV: 127. That e-mail repeated the consolidation cover story. Similarly, in July 2000, Coplan sent an e-mail asking Vaughn, Shapiro, Nissenbaum, and others to "make any final changes" to a draft client solicitation letter. But contrary to the Government's assertions, there is no evidence that Shapiro actually or habitually "reviewed" the Add-On solicitation letters before they were sent to clients. Indeed, according to the trial testimony of cooperator Belle Six, Shapiro was not among the people who were "part of th[e] process" of "sending out letters to clients." A II: 424–25/2391–93.

Shapiro maintains that he had no reason to understand or suspect the economics of the Add-On shelter until February 12, 2003—years after the Add-On marketing campaign—when he received draft "Talking Points" that contained the details necessary to assess the profit potential of the transaction.[24] After reviewing the draft, Shapiro asked whether "the 2:1 ratio"[25] describing

---

[24] Under the so-called "objective" prong of the economic substance doctrine, transactions that lack profit potential may be disallowed by the IRS. *See* Jerome B. Libin, *Congress Should Address Tax Avoidance Head-On: The Internal Revenue Code Needs a GAAR*, 30 Va. Tax Rev. 339, 345–46 (2010) ("Some lower courts have viewed 'economic substance' as a test having two separate requirements (subjective business purpose and objective pre-tax profit potential) that must be satisfied before a transaction will be accorded the tax benefits claimed."); *see also Modern Tax Controversies*, 957 Practicing Law Inst. 478-1, 478-35 (2012) ("To analyze a transaction for the presence of objective economic substance, courts look to see if there is an objective potential for profit and/or the presence of genuine risk.").

[25] The "2:1 ratio" (profit: premium) refers to the fact that, absent the highly unlikely "home run" scenario discussed *post*, the potential payoff of the Add-On transaction before fees was "two times the net investment amount."

potential payoff was "correct" and what "the impact of fees" was on the profitability of the transaction. He then learned from Coplan that "[a]pparently, in the [A]dd-[O]n the 2:1 payoff *would not exceed the transaction fees* paid to E&Y and Bolton totaling 1.5% of the loss amount since the net premium was under 1%." A V: 20 (emphasis added). The Government offers no explanation for why Shapiro would ask about the payoff ratio and impact of fees if he already knew that the Add-On shelter lacked profit potential.

*Add-On Defense.* The Government further argues that, by "reviewing and approving" a chart for use in an IRS deposition, Shapiro himself committed an affirmative act of tax evasion. The chart at issue depicted the "home run" or "sweet spot" scenario in which the Add-On shelter would produce a huge windfall to the client. Although the Government conceded at trial that "the numbers on the chart are true," it argues that the chart was used to mislead the IRS by attempting to establish a false non-tax motivation for a transaction. In response, Shapiro argues that there is no evidence that he did anything affirmative with the chart, which correctly sets forth a variety of outcomes for the transaction, including the extraordinarily unlikely "home run." At most, Shapiro's time records reflect that "he reviewed it" for an hour and a half.

Finally, the Government points to correspondence regarding the Add-On "amnesty template" as evidence of Shapiro's participation in a tax evasion conspiracy.[26] It appears that Shapiro did provide comments on the Add-On amnesty template, although the record does not reflect the scope or content of his suggestions. The Government faults Shapiro for leaving the cover story undisturbed in the amnesty template, but it is not at all apparent that Shapiro in fact knew that the cover story was "bogus." The Government argues that because Shapiro had seen an

---

[26] In December 2001, the IRS announced an amnesty program under which taxpayers who had engaged in tax shelters could voluntarily disclose those transactions to the IRS in order to avoid potential penalties. The defendants helped to craft amnesty templates that E&Y's clients could submit to the IRS.

"instant message" from Vaughn proposing the Add-On concept, he knew that the "consolidation" business purpose was false. But nothing in the instant message exchange suggested that the Add-On business purpose was false; instead, the cover story was developed during conference calls and e-mail correspondence in which Shapiro did not participate.

### iii. False Statement Objective

The third and final objective of the § 371 conspiracy imputed to Shapiro and charged in Count One, the false statements objective, was clearly directed to the conduct charged in Counts Six and Seven. *See* A VI: 420/6161 ("Section 1001 is not only charged as an object of the conspiracy, but is also charged in Counts Six and Seven as separate substantive offenses against defendants Coplan and Vaughn . . . ."). As previously noted, Counts Six and Seven charged defendants Coplan and Vaughn with making false statements to the IRS. The Government does not contend that Shapiro even knew about the Coplan and Vaughn depositions before they occurred, much less discussed their testimony with them. There was no separate substantive false statements charge against Shapiro in connection with his own IRS deposition.

### iv. The Conspiracy "As a Whole"

Having reviewed the record and the arguments of counsel, we conclude that the evidence against Shapiro is insufficient to support his conviction on Count One. In reaching this conclusion, we are mindful that the absence of direct evidence is not dispositive, since "the government is entitled to prove its case solely through circumstantial evidence." *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004). Nevertheless, "[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Huezo*, 546 F.3d 174, 193 (2d Cir. 2008) (internal quotation marks omitted). In this case, an essential element of the conspiracy

28

charged in Count One required proof beyond a reasonable doubt that Shapiro joined the alleged conspiracy with the "specific intent" to violate the law. *United States v. Ogando*, 547 F.3d 102, 107–08 (2d Cir. 2008); *Rodriguez*, 392 F.3d at 545 ("To sustain a conspiracy conviction, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy *knew* of the existence of the scheme alleged in the indictment and *knowingly joined and participated in it*.") (emphasis added) (quotation marks omitted). The evidence with respect to Shapiro's intent, viewed in the light most favorable to the Government, remains, at best, in equipoise. Because "[i]t would not satisfy the [Constitution] to have a jury determine that the defendant is *probably* guilty," *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993), we conclude that Shapiro's conviction on Count One must be reversed.

## 2. Conspiracy Evidence Against Nissenbaum

### i. *Klein* Conspiracy Objective

*PICO Amnesty Template.* The principal conspiracy evidence against Nissenbaum relates to his participation in the development of the PICO amnesty template. *See* note 26, *ante*. The Government asserts that Nissenbaum "drafted, and then circulated to Shapiro and Coplan for their review, a template for the PICO amnesty submission." The strongest evidence to support the Government's assertion is a February 28, 2002 e-mail Nissenbaum sent to Shapiro and Coplan with the draft PICO template attached. The text of the e-mail reads as follows: "Gentlemen, your comments. Bob, did you also want me to do an SDI template [referring to a different tax shelter]?" Because the PICO template contained false and misleading descriptions of the transaction, the Government claims that Nissenbaum knowingly participated in providing false information directly to the IRS. But once again, the record belies the Government's gloss. Dougherty testified that *he* "drafted the [PICO] amnesty letters based on a template from the SISG tool kit," and that the template "generally tracked the

opinion letter" for the transaction. With respect to Nissenbaum's role in developing the template, Dougherty testified as follows:

> My recollection was that Martin Nissenbaum was the reviewer of the template letters that I prepared and he provided some non-substantive comments on the final version of the letters to go out to the clients.

A II: 235/1641. Dougherty further testified that the "non-substantive comments" Nissenbaum provided were to "take out the bold" and "correct[] a typo."

*Advice to Keep CDS Trading Account Open.* The e-mail chain regarding the extension of the CDS trading account, raised with respect to Shapiro above, *see* Part II.A.1.i, *ante*, also features in the conspiracy case against Nissenbaum. In a November 12, 2001 e-mail, Coplan asked Shapiro and Nissenbaum about a CDS shelter in which "[t]heir swaps have terminated, but Bolton is suggesting that the partnership be shut down after essentially 13.5 months." A IV: 219. Coplan's question was whether E&Y should "intercede and suggest running another year out with the trading account?" Nissenbaum responded: "Yes. They sound way too anxious to get out." From this exchange, the Government argues that "[t]he defendants were understandably concerned about the taxpayers appearing 'too anxious to get out' of the trading account because that hasty exit would undermine the false description of the trading account as an investment vehicle."

But it appears that, in the context of the e-mail exchange, the pronoun "they" in Nissenbaum's two-sentence e-mail is not a reference to anxious "taxpayers." The e-mail appended to Coplan's initial inquiry was a note from Cam Hasseltine, an employee of the Bolton firm, which was managing the CDS trading accounts. Hasseltine's e-mail, which suggested the termination of the CDS account, was addressed to Robert Coplan, Belle Six, and two other E&Y employees—not to the taxpayer clients at issue. If anyone was "too anxious to get out" of the CDS shelter, it was the Bolton employees *managing* the trading accounts, not the taxpayers who entered the transaction.

*Review of Add-On Documents.*  Finally, the Government points to Nissenbaum's review of various Add-On documents as evidence of his participation in the *Klein* conspiracy.  In March 2000, Coplan sent a draft Add-On amnesty template to Nissenbaum, Shapiro, and another E&Y employee with a request to look it over "to avoid unnecessary facts or to make it easier to complete accurately."  Twenty minutes later,[27] Nissenbaum replied with a three-line e-mail:

> The disclosure looks fine to me except that I don't believe that it's necessary to put the specifics of each option trade in the letter.  If we do it here, presumably we'd have to include the hundreds of trades that are done in PICO.

A IV: 400.  Nothing in Nissenbaum's response evinced a knowing "stamp of approval" for the consolidation cover story in the Add-On amnesty template.  Similarly, Nissenbaum also received a July 2000 e-mail from Coplan suggesting that Nissenbaum and others should make "any final changes" to a draft Add-On client solicitation letter.  But, as with Shapiro, there is no evidence that Nissenbaum actually "reviewed" the Add-On solicitation letters; nor was he "part of th[e] process" of "sending out letters to clients."

### ii.  Tax Evasion Objective

With respect to the alleged tax evasion objective of the § 371 conspiracy, Nissenbaum contends that the evidence is similarly insufficient.  Nissenbaum did not participate in telephone conferences or meetings related to the development of the Add-On shelter.  Although Nissenbaum occasionally received copies of e-mail correspondence related to Add-On, it appears that he responded only once—in the three-line e-mail quoted above.  Indeed, the Government appeared to acknowledge the dearth of direct evidence as to Nissenbaum in response to his motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  *See* A III: 516 (Nissenbaum "[a]dmittedly . . . doesn't have the same involvement that Mr. Coplan and Mr. Vaughn and Mr. Shapiro do").

---

[27] The time stamp on Coplan's initial e-mail was 9:16 a.m.; the time stamp on Nissenbaum's reply was 8:36 a.m.  Thus, it appears that the clock on one of the two computers was off by one hour.

Instead, the Government's principal theory of tax evasion liability for Nissenbaum was based on *Pinkerton v. United States*, 328 U.S. 640 (1946). Under *Pinkerton*, "[o]nce a conspiracy has been established, the criminal liability of its members extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy." *United States v. Gallerani*, 68 F.3d 611, 620 (2d Cir. 1995) (internal quotation marks omitted). *Pinkerton* is not "a broad principle of vicarious liability that imposes criminal responsibility upon every co-conspirator for whatever substantive offenses any of their confederates commit." *United States v. Bruno*, 383 F.3d 65, 90 (2d Cir. 2004) (quotation marks omitted). Instead, *Pinkerton* provides that "a defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant as a consequence of their criminal agreement." *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (quotation marks omitted).

The Government argues that Nissenbaum was guilty under a *Pinkerton* liability theory because it was reasonably foreseeable that a coconspirator would commit tax evasion. As previously noted, the trial defendants (including Nissenbaum) concede that they were aware of Add-On's lack of profit potential as of February 2003, when an e-mail exchange revealed the impact of fees on the profitability of the transaction. *See* Part II.A.1.ii, *ante*. The Government argues that, because Nissenbaum was also aware that the IRS was conducting depositions related to the ongoing audit of the Add-On shelter, it was reasonably foreseeable to him that a coconspirator would commit tax evasion. The Government does not, of course, assert the proposition that the mere fact of an ongoing IRS inquiry suggests, much less shows, criminal intent or knowledge that the subject of the inquiry is unlawful.

The trouble with the Government's argument is that "even *Pinkerton* liability . . . is premised on a mental state." *United States v. Ferguson*, 676 F.3d 260, 279 n.18 (2d Cir. 2011) (citing *Pinkerton*, 328 U.S. at 647 ("The criminal intent to do the act is established by the formation of the conspiracy.")). In other

words, although *Pinkerton* may permit a broader scope of liability for established coconspirators, the doctrine does not dilute or erode the basic requirement that "the person charged with conspiracy *knew* of the existence of the scheme alleged in the indictment and *knowingly joined and participated* in it." *Rodriguez*, 392 F.3d at 545 (emphasis added) (quotation marks omitted). The Government's only attempt to identify an affirmative act by Nissenbaum that would demonstrate the requisite criminal intent is the three-line March 2000 e-mail. That is simply not enough.

### iii. False Statements Objective

As previously noted, *see* Part II.A.1.iii, *ante*, the false statements objective of the § 371 conspiracy was clearly directed to the conduct charged in Counts Six and Seven. The Government does not contend that Nissenbaum was aware of or involved in the false statements to the IRS during the Coplan and Vaughn depositions. There was no separate substantive false statements charge against Nissenbaum in connection with his own deposition.

### iv. The Conspiracy "As a Whole"

Having examined the evidence against Nissenbaum with respect to each of the three objectives of the § 371 conspiracy charged in Count One, we turn again to the task of "looking at [the conspiracy] as a whole." *Cont'l Ore Co.*, 370 U.S. at 699. Once again, our review of the record and the arguments of counsel compels the conclusion that the evidence against Nissenbaum is insufficient to support his conviction on Count One. Viewed in the light most favorable to the Government, the evidence with respect to Nissenbaum's intent "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks omitted). Under these circumstances, "a reasonable jury must necessarily entertain a reasonable doubt." *Id.* (quotation marks omitted). Accordingly, we conclude that Nissenbaum's conviction on Count One must be reversed.

## B. Sufficiency of the Evidence Supporting Counts Two and Three

Defendants Shapiro and Nissenbaum also challenge the sufficiency of the evidence to support their convictions on Counts Two and Three, which charged all the trial defendants with tax evasion in violation of 26 U.S.C. § 7201. To prove a violation of § 7201, the Government must establish beyond a reasonable doubt (1) a substantial tax deficiency; (2) willfulness, meaning the intentional violation of a known legal duty; and (3) an affirmative act "with the intent to evade or defeat a tax or payment of it." *United States v. Romano*, 938 F.2d 1569, 1571 (2d Cir. 1991). We have already reviewed the evidence supporting the tax evasion liability of both Shapiro and Nissenbaum in connection with the foregoing discussion of the tax evasion conspiracy objective. *See* Part II.B.1.ii, II.B.2.ii, *ante.* For substantially the reasons that compel reversal as to Count One,[28] we conclude that the convictions of Shapiro and Nissenbaum on Counts Two and Three must be reversed.[29]

## C. Sufficiency of the Evidence Supporting Count Four

Finally, Nissenbaum challenges the sufficiency of the evidence on Count Four, which charged him with obstruction of the IRS in violation of 26 U.S.C. § 7212(a). As previously noted, § 7212(a) prohibits conduct by which a defendant "corruptly or by force or threats of force . . . obstructs or impedes, or endeavors to obstruct or impede, the due administration of [the internal revenue code]." 26 U.S.C. § 7212(a). "The key words in [§] 7212(a) are 'corruptly' and 'endeavors.'" *United States v.*

---

[28] In her partial dissenting opinion, Judge Kearse suggests that Shapiro and Nissenbaum could be convicted on Counts 2 and 3 under *Pinkerton.* We disagree because, as noted above, there is insufficient evidence that Shapiro or Nissenbaum "knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *Rodriguez*, 392 F.3d at 545 (quotation marks omitted).

[29] In her partial dissent, Judge Kearse reaches the opposite conclusion with regard to Shapiro's and Nissenbaum's convictions on Counts 1-3. In response, we simply note that sufficiency challenges are highly fact-specific inquiries that require a careful examination of the record. *See, e.g., Ospina v. Trans World Airlines, Inc.*, 975 F.2d 35, 37 (2d Cir. 1992) ("[T]his case turns on whether plaintiffs introduced sufficient evidence to support the jury's verdict . . . a necessarily fact-specific inquiry."). For the reasons stated above, our close review of the record leads us to the conclusion that "the evidence presented at trial fell considerably more than 'a trifle short'; but even a trifle short is insufficient." *United States v. Muniz*, 60 F.3d 65, 73 (2d Cir. 1995) (Kearse, J., dissenting).

*Kelly*, 147 F.3d 172, 176 (2d Cir. 1998). The District Court instructed the jury as follows:

> To act corruptly means to act with the intent to secure an unlawful advantage or benefit either for oneself or for another. Acting corruptly requires consciousness of wrongdoing.

A VI: 428/6193–94. Although we have previously declined to read a willfulness requirement into § 7212(a), we have held that a substantially similar jury instruction was "as comprehensive and accurate as if the word 'willfully' was incorporated in the statute." *Kelly*, 147 F.3d at 177.

Here, the Government argues that Nissenbaum violated § 7212(a) by causing false and misleading statements to be submitted to the IRS in response to an IRS Information Document Request ("IDR") regarding the Tradehill tax shelter. The evidence with respect to Count Four principally turns on the implications of the testimony of two E&Y partners who participated in the Tradehill transaction, Jacob Blank and Martin Flashner, and who testified at trial pursuant to immunity orders. Count Four originally alleged that the IDR contained four false statements:

*(1) Profit motivation.* The first allegedly false statement in the IDR response was that the E&Y partners had entered into the Tradehill transaction in order to generate profits. After Nissenbaum's counsel made a Rule 29 motion on Count Four, the Government agreed to withdraw the allegation that this statement was "false and misleading" and to redact the Indictment accordingly.

*(2) Euro exposure.* The second allegedly false statement in the IDR response, as summarized in the Redacted Indictment, was that "the Tradehill transaction was intended fully to hedge the partners' exposure to fluctuation in the euro." The Redacted Indictment alleged that this statement was false because "in reality, the transaction had no capacity to do so." A I: 106.

The statement at issue appeared in response to the first question in the IDR questionnaire: "Describe all of your reasons and/or objectives for entering into the Transaction. For each reason and/or objective, were these reasons and/or objectives achieved?" The IDR response letter, which

35

was submitted and signed by Proskauer Rose LLP ("Proskauer") attorney Abraham Gutwein ("Gutwein"), included a ten-paragraph answer to question one. Among those ten paragraphs, the Government primarily quarrels with the following passage:

> Partly in order to hedge his exposure to the euro and to offset the losses sustained to date with respect to his Cap Gemini holdings, the taxpayer entered into the option transactions on November 1, 2000.

> Under the currency option positions purchased and sold, the taxpayer would stand the potential of a substantial profit if the euro continued to decline in value relative to the dollar (as had been the prevailing trend) at the option exercise dates. . . . In that manner the taxpayer intended to fully hedge his exposure to fluctuation in the value of the euro.

SA 812.

The Government argues that the direct examination of Blank and Flashner, the principal witnesses with respect to Count Four, conclusively established that they did not enter the Tradehill transaction in order to hedge against exposure to the euro. We disagree. Blank's testimony, for example—both on cross-examination and redirect examination—showed that his tax-minimization purpose was not the only objective of the Tradehill transaction. On direct examination, Blank testified as follows:

Q: Did you enter into the transaction in order to hedge your exposure to the euro?

A: No, I did not.

. . . .

Q: Why then was it not your purpose to hedge the euro?

A: The purpose of entering into the transaction was really to generate the loss. That was the real reason . . . I made my investment. The fact that foreign currency options were used, there was an exposure, . . . it certainly was a factor or a competing factor that we were able to focus on, but . . . foreign currency exposure was not the reason we entered into the deal. The reason was to get the tax loss.

. . . .

Q: What, if any, understanding did you have at the time of the transaction about how much of a hedge this transaction could provide?

A: I had none.

Q: What, if any, discussions did you have with other members of the transaction about how much of a hedge this transaction could provide?

A: None.

. . . .

Q: This [IDR response] says: In that manner the taxpayer intended to fully hedge his exposure to fluctuation in the value of the euro, is that statement true?

A: It's not correct.

A II: 588/3037–38. But on cross examination, Blank equivocated by acknowledging that hedging against fluctuations in the euro was "an objective," as follows:

Q. I'm not asking you your primary objective, sir. I'm asking you [whether] an objective of entering into th[e] [Tradehill] transaction was to hedge the currency? An objective.

THE COURT. Yes or no. Can you answer it?

Q. At that time.

A. At that time, yes.

. . . .

Q. The [IDR] question did not ask you what your primary objective was, did it?

A. That is correct.

. . . .

Q. So the three objectives that the participants had were to hedge against the currency, were to make money, and the obvious, tax motive. That's why everybody is doing this, is that correct, sir?

. . . .

A. Yes.

37

A II: 609/3121–23. And on redirect examination, the Government harked back to Blank's testimony that because the Cap Gemini stock he had received "was not denominated in dollars" but rather "was denominated in a foreign currency, . . . the justification for entering into the transaction from a business perspective was to be able to, in effect, hedge and try to reduce the risk associated with owning non-U.S. dollar denominated investments." A II: 570/2966–67. It sought clarification:

> Q. On direct examination you said that hedging the euro was a justification for the transaction. Do you remember using that word?
>
> A. Yes, sir, I do.
>
> Q. What did you mean by that?
>
> A. At the time we entered into the transaction, I was desirous of assuring that there was a business purpose for the transaction, and at that time I did have the foreign currency exposure, because, again, the stock that we were awarded in the sale was not denominated in dollars, it was in foreign currency, and to the extent that the transaction we entered offered, to the best of my knowledge at the time, the possibility of trying to mitigate or hedge some of the risk associated with the dollar going up or the dollar going down, that to me at that time, based on what I understood then, represented a business purpose for entering into this transaction.
>
> Q. Was it the reason you entered into the transaction?
>
> A. It was not the primary reason.

A II: 618/3156.

The record reflects a similar tension with respect to Flashner, who testified on direct examination that he did not enter the Tradehill transaction in order to hedge his exposure to the euro, A III: 24/3395, but admitted on cross examination that the E&Y partners discussed the "exchange rate risk" presented by their receipt of stock denominated in euros, A III: 32/3424. Flashner further testified that "it would make sense" to protect his investment "by trying to make some money from this downward movement of the euro against the dollar." A III: 33/3430–31. Finally, Flashner

admitted that his goals in investing in Tradehill were "two-fold": to obtain tax losses and "to earn a profit from the transaction." A III: 24/3394.

Faced with obvious internal tension within the testimony of its two principal witnesses on Count Four, the Government avers that "the jury was entitled to rely on the direct examination." Gov't's Br. 185–86. But even if the jury fully credited the *direct* examination, as we must assume here, that testimony lends implicit support to Nissenbaum's defense as well. As noted above, Blank's direct testimony was that "[t]he purpose of entering into the transaction was really to generate the loss. That was the *real reason* . . . I made my investment. The fact that foreign currency options were used, there was exposure . . . it certainly was *a factor* or a competing factor that we were able to focus on, but . . . foreign currency exposure was not the reason we entered into the deal." A II: 588/3037. The straightforward implication of Blank's testimony is that hedging against fluctuations in the euro was not the primary reason for entering the Tradehill transaction. But that was not the question posed by the IDR. Question number one prompted the taxpayer to "[d]escribe *all* of your reasons and/or objectives for entering the Transaction." Blank's statement—in the same sentence excerpted by the Government—that foreign currency exposure "certainly was a factor" appears consistent with the statement in the IDR response that the transaction was entered "*[p]artly* in order to hedge." SA 812 (emphasis added).

*(3) Non-written understandings.* The third allegedly false statement in the IDR response was that "[t]here were no non-written understandings" among the participants in the Tradehill transaction. . The Redacted Indictment alleged that this statement was false because "in reality, there was an understanding among all the parties to the transaction that the E&Y partners would exit their option positions before the end of 2000, in order to claim tax losses they could use to offset their . . . income." A I: 106.

There was no affirmative testimony about the existence of "non-written understandings" among the Tradehill participants. In fact, both Blank and Flashner denied engaging in discussions with any other E&Y partner about exiting their option positions. A II: 578/ 2997, 579/3000, 580/3005 (Blank); A III: 23/3389 (Flashner). Nevertheless, the Government insists that the "entire thrust" of their testimony was that the partners were entering the Tradehill transaction to generate a tax loss for the same tax year, and would take the steps necessary to that end.

Even assuming *arguendo* that the Government is correct about the "thrust" of the testimony, a more fundamental defect in this allegation remains: the Tradehill participants retained Gutwein—not Nissenbaum—to represent them with regard to the IRS audit. Gutwein, who had powers of attorney from the Tradehill participants, substantially revised a response that Nissenbaum proposed about "understandings" among the E&Y partners. In a draft IDR response, Nissenbaum noted that "[a]ny 'understandings' involved the purchase and contribution of the options, the creation of the various entities and the sale of the assets that generated the losses." A V: 130. Gutwein then revised the response to state that "[t]here were no non-written understandings between the [Tradehill participants]." Thus, it appears that the language suggested by Nissenbaum was *more accurate* than the language of the final IDR response.

*(4) Future referral of business.* The final allegedly false statement in the IDR response was that there was no expectation or referral of any future business to Proskauer, "when in reality, in 2001, the defendants referred PICO clients to [Proskauer] for opinion letters." The Government relies on the fact that about the time Proskauer was completing the legal opinions for the Tradehill shelter, it was given the paid work of writing PICO opinions, which had to that point been prepared by Arnold & Porter. Based on the timing, the Government argues that the jury was free to conclude that there was indeed an "expectation or referral" of future business, rendering the IDR statement to the contrary

false and misleading. But Blank and Flashner did not testify to any expectation or referral of future business to Proskauer. In the absence of any affirmative proof, we are left only with the "speculation and surmise" that such an expectation existed. *Langston v. Smith*, 630 F.3d 310, 314 (2d Cir. 2011) ("[A] conviction based on speculation and surmise alone cannot stand . . . .") (quotation marks omitted).

Having reviewed the record and the arguments of counsel, we conclude that the record compels reversal of Nissenbaum's conviction on Count Four. Given the equivocal testimony by Blank and Flashner and the role of Gutwein in drafting the IDR response, "a reasonable jury must necessarily entertain a reasonable doubt" as to whether Nissenbaum corruptly obstructed or impeded the IRS. *Glenn*, 312 F.3d at 70 (quotation marks omitted).[30]

### III. Propriety of Venue for Count Six, Charging Vaughn with False Statements to the IRS

Defendant Vaughn challenges the propriety of venue for Count Six, charging him with making false statements to the IRS during a June 12, 2002 deposition in Nashville, Tennessee, in violation of 18 U.S.C. § 1001.

#### A. Legal Standard

Because "[p]roper venue in criminal proceedings was a matter of concern to the Nation's founders," the United States Constitution "twice safeguards the defendant's venue right." *United States v. Cabrales*, 524 U.S. 1, 6 (1998). Article III requires that "the Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3. The Sixth Amendment further provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been

---

[30] It bears underscoring the fact that Judge Kearse agrees with our reversal of Nissenbaum's conviction on Count Four on sufficiency grounds.

committed." *Id.* amend VI;[31] *see also* Fed. R. Crim. P. 18 (requiring that "the government must prosecute an offense in a district where the offense was committed").

When the relevant federal statute does not specify how to determine the location where the crime was "committed," "[t]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Cabrales*, 524 U.S. at 6–7. In conducting this inquiry, we "must initially identify the conduct constituting the offense . . . and then discern the location of the commission of the criminal acts." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999). "Venue is proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place." *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (quoting *Rodriguez-Moreno*, 526 U.S. at 280).

"When a crime consists of a single, non-continuing act, the proper venue is clear: The crime is 'committed' in the district where the act is performed." *United States v. Ramirez*, 420 F.3d 134, 139 (2d Cir. 2005) (other internal quotation marks omitted). In other cases, "where the acts constituting the crime and the nature of the crime charged implicate more than one location, the Constitution does not command a single exclusive venue." *United States v. Magassouba*, 619 F.3d 202, 205 (2d Cir. 2010) (internal quotation marks and alterations omitted). Congress has codified the so-called "continuing offense" rule in 18 U.S.C. § 3237(a), which provides in relevant part:

> Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be . . . prosecuted in any district in which such offense was begun, continued, or completed.

The Government bears the burden of proving that venue is proper. *Tzolov*, 642 F.3d at 318. "[T]he venue requirement, despite its constitutional pedigree, is not an element of a crime so as to require proof beyond a reasonable doubt; rather, venue need be proved only by a preponderance of the

---

[31] "Technically, Article III specifies 'venue' and the Sixth Amendment specifies 'vicinage,' but that refined distinction is no

evidence." *United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007) (emphasis and internal quotation marks omitted). The propriety of venue is a question of law that we review *de novo*. *United States v. Drachenberg*, 623 F.3d 122, 124 (2d Cir. 2010).

The federal false statements statute, 18 U.S.C. § 1001(a), makes it a crime, *inter alia*, "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . [to] make[] any materially false, fictitious, or fraudulent statement or representation." 18 U.S.C. § 1001(a)(2).

We have considered the issue of venue for a § 1001(a) violation on two prior occasions. In *United States v. Candella*, 487 F.2d 1223 (2d Cir. 1973), a case arising in the Southern District of New York, the defendants were charged with making false statements based on fraudulent affidavits that were submitted to a municipal branch office in Brooklyn and then conveyed to the Housing and Urban Development office in Manhattan. *Id.* at 1227. We held that, although the crime began in the Eastern District of New York, "it does not follow that the crime then terminated, and that what transpired in Manhattan was irrelevant for venue purposes." *Id.* at 1228. In *United States v. Ramirez*, 420 F.3d 134 (2d Cir. 2005), we elaborated upon the reasoning of *Candella*, holding that, where a false statement was made in one jurisdiction and then transmitted to another, venue was proper in both jurisdictions. *Id.* at 143 (holding that venue was proper in the Southern District of New York because the "'statements continued to be false and continued to be in the jurisdiction of the United States' when they finally reached Manhattan" (quoting *Candella*, 487 F.2d at 1228)).[32]

---

longer of practical importance." *United States v. Royer*, 549 F.3d 886, 893 n.8 (2d Cir. 2008).

[32] Vaughn seeks to distinguish *Candella* and *Ramirez* because both cases involved written false statements in violation of § 1001(a)(3), rather than oral false statements in violation of § 1001(a)(2). To that end, Vaughn contrasts the text of § 1001(a)(3), which prohibits the "mak[ing] or *us[ing]*" of a written false statement, with the text of § 1001(a)(2), which prohibits only the "mak[ing]" of an oral false statement. But *Candella* and *Ramirez* did not rely upon the subsequent "use" of the false statements in order to find that venue was properly laid. Moreover, we find no indication in the text of § 1001(a) that subsection (a)(2) is to be treated differently than subsection (a)(3) for purposes of venue.

## B. Venue for Count Six

Vaughn contends that venue for Count Six was improper because his statements were both made and received during the IRS deposition in Nashville. For that reason, Vaughn argues, the subsequent review and analysis of his statements by IRS officials in Manhattan afforded no basis for venue in the Southern District of New York. We disagree.

We begin by identifying the "essential conduct elements" of § 1001(a)(2). *Rodriguez-Moreno*, 526 U.S. at 280. In *United States v. Ali*, 68 F.3d 1468 (2d Cir. 1995), *amended on denial of reh'g*, 86 F.3d 275 (2d Cir. 1996), we held for the first time that materiality is a statutory element of all charges under § 1001. *Ali*, 68 F.3d at 1474–75; *see United States v. Mandanici*, 205 F.3d 519, 523 (2d Cir. 2000). Thus, in order to secure a conviction under § 1001(a)(2), the Government must prove that a defendant (1) knowingly and willfully, (2) made a *materially* false, fictitious, or fraudulent statement, (3) in relation to a matter within the jurisdiction of a department or agency of the United States, (4) with knowledge that it was false or fictitious or fraudulent.[33]

But not all statutory elements constitute "essential conduct elements" within the meaning of *Rodriguez-Moreno*. In reviewing the elements of § 1001, the Supreme Court has noted that the statutory requirement that the false statement be made "in any matter within the jurisdiction . . . of the United States" is "jurisdictional language [that] appears in a phrase separate from the prohibited conduct" and is simply a "predicate circumstance" of the offense. *United States v. Yermian*, 468 U.S. 63, 68–69 (1984) (quotation marks omitted). Similarly, the *mens rea* requirement constitutes "a circumstance element that does not contribute to determining the *locus delicti* of the crime." *United States v. Oceanpro Indus., Ltd.*, 674

---

[33] Since *Ali*, we have occasionally stated the elements of a § 1001 false statements charge without mentioning the materiality element. *See, e.g., United States v. Wiener*, 96 F.3d 35, 37 (2d Cir. 1996) ("To convict a defendant of violating Section 1001, the government must prove that the defendant: (i) knowingly and willfully, (ii) made a statement, (iii) in relation to a matter within the jurisdiction of a department or agency of the United States, (iv) with knowledge that it was false or fictitious and fraudulent."). In light of our explicit holding that "materiality is indeed an element of the offense," *Ali*, 68 F.3d at 1475, our subsequent failure to incorporate materiality into our standard recitation of the statutory elements of § 1001 appears to be the result of a simple oversight.

F.3d 323, 329 (4th Cir. 2012).[34] Thus, the essential conduct prohibited by § 1001(a)(2) is the making of a materially false, fictitious, or fraudulent statement.

In this case, the materiality requirement proves dispositive with respect to venue. "Under § 1001, a statement is material if it has a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed, or if it is capable of distracting government investigators' attention away from a critical matter." *United States v. Adekanbi*, 675 F.3d 178, 182 (2d Cir. 2012) (internal citations, quotation marks, and alterations omitted). Accordingly, whether Vaughn's false statements were material turns on the tendency or capacity of those statements to influence the decisionmaking body at issue—in this case, the IRS.

Proving the materiality of Vaughn's false statements in Tennessee necessarily requires evidence that those statements were conveyed to or had an effect on the IRS investigators working in the Southern District of New York. *Oceanpro*, 674 F.3d at 329; *see United States v. Salinas*, 373 F.3d 161, 167 (1st Cir. 2004) ("When materiality is a critical component of the statutory definition, it makes perfect sense to consider the crime as continuing into the district in which the effects of the false statement are felt."); *United States v. Ringer*, 300 F.3d 788, 792 (7th Cir. 2002) (finding venue in the district where the investigation was "reasonably likely to be affected by [the defendant's] statements"); *but see United States v. Smith*, 641 F.3d 1200, 1208 (10th Cir. 2011) (finding venue, where false statement was not recorded, only in the jurisdiction where the false statement was made). We therefore conclude that venue for

---

[34] *Cf. United States v. Clenney*, 434 F.3d 780, 782 (5th Cir. 2005) (holding that the intent element of the parental kidnapping statute, 18 U.S.C. § 1204, "merely speaks to the offender's *mens rea* as he commits the conduct essential to the crime; it is plainly not an 'essential conduct element' as required by *Rodriguez-Moreno*"); *Ramirez*, 420 F.3d at 144 ("While a scheme to defraud is certainly one of three essential elements of mail fraud, it is not an essential *conduct* element. . . . It is the *mens rea* element of mail fraud."); *United States v. Bowens*, 224 F.3d 302, 313 (4th Cir. 2000) (holding that language "defin[ing] the requisite intent for the offense" of harboring a fugitive, 18 U.S.C. § 1071, was not an essential conduct element).

Count Six was proper in the Southern District of New York.[35]

This result is fully consistent with our holdings in *Candella* and *Ramirez*. It is undisputed that Vaughn "ma[de]" the false statements at issue during the IRS deposition in Nashville—but "it does not follow that the crime then terminated, and that what transpired in Manhattan was irrelevant for venue purposes." *Candella*, 487 F.2d at 1228. In *Ramirez*, the offense began in New Jersey, where the fraudulent paperwork was filed, and ended in the Southern District of New York, the jurisdiction to which New Jersey officials forwarded the paperwork. *Ramirez*, 420 F.3d at 137–38. Similarly, the instant offense case began in Tennessee, where Vaughn made the false statements to IRS officials, but continued into the Southern District of New York, where his deposition transcript was reviewed and discussed by IRS officials in connection with the ongoing E&Y audit. The fact that Vaughn's statements "'continued to be false and continued to be in the jurisdiction of the United States when they finally reached Manhattan,'" *Ramirez*, 420 F.3d at 143 (quoting *Candella*, 487 F.2d at 1228)), confirms our view that venue was proper in the Southern District of New York.

On occasion, we have supplemented our venue inquiry with a "substantial contacts" test that "takes into account a number of factors—the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding." *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985). Since *Reed*, we have alternately applied and ignored the substantial contacts test. *Compare United States v. Royer*, 549 F.3d 886, 893 (2d Cir. 2008) (citing *Reed* with approval); *United States v. Saavedra*, 223 F.3d 85, 92–93 (2d Cir. 2000) (same); *with United States v. Tzolov*, 642 F.3d 314, 321 (2d Cir. 2011) ("Though *Reed* refers to a 'substantial contacts rule' for determining venue . . . it is clear that the [court] regarded the locale of the defendant's

---

[35] Vaughn similarly argues that the grand jury lacked jurisdiction to return Count 6 of the Superseding Indictment because the offense was committed outside the district where the jury was impaneled. This challenge fails for substantially the same reasons as his venue challenge. *See* Part III.C, *ante*.

46

acts as a sufficient basis for establishing venue." (alteration in original) (other internal quotation marks omitted)).

We have previously held, and we now clarify, that use of the substantial contacts test may be appropriate where, as here, the defendant "argue[s] that his prosecution in the [contested district] . . . [will] result[] in a hardship to him, prejudice[] him, or undermine[] the fairness of his trial." *United States v. Magassouba*, 619 F.3d 202, 205 n.2 (2d Cir. 2010). We think the District Court in this case proceeded with the required care by considering the factors enumerated in *Reed* and *Saavedra* before concluding that "the substantial contacts analysis weighs in favor of venue in this district." Vaughn does not appear to challenge the substance of that determination on appeal.

## IV. Admission of Graham Taylor Testimony

In addition to their validity, sufficiency, and jurisdictional challenges, the trial defendants also mount a variety of evidentiary challenges. In the first of these, they argue that the District Court erred in admitting the testimony of Graham Taylor, a tax attorney who worked at the law firm of Pillsbury Madison and who indisputably committed a variety of crimes involving tax shelters unrelated to this case. We review the District Court's rulings regarding the admissibility of evidence at trial for abuse of discretion. *United States v. Williams*, 585 F.3d 703, 707 (2d Cir. 2009); *cf. In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (explaining that the term of art "abuse of discretion" includes errors of law).

In 1999, Taylor had a series of discussions about the CDS transaction with E&Y partner David Smith, the defendant in this action who was a fugitive at the time of trial. Taylor drafted an initial opinion letter regarding the CDS transaction, and Smith eventually brought the transaction and the draft opinion letter to E&Y. Taylor's draft opinion letter contained a variety of statements regarding the CDS transaction that he knew were false, including statements that (1) the purpose of the partnership was investment profit; (2) the investors would have money at risk; and (3) that early

47

termination of the swap was not predetermined. Taylor testified that he and Smith had agreed that these core elements of the transaction could not be disclosed in the opinion letter if the transaction were to yield the intended tax benefits. Other than a brief phone call with two unknown E&Y employees in June 1999, Taylor had no contact with anyone else at E&Y. E&Y ultimately engaged Brent Clifton at Locke Liddell rather than Taylor to write the CDS opinion letter.

The defendants moved to exclude Taylor's testimony prior to trial, arguing that his testimony would consist primarily of recounting his conversations with Smith. The defendants argued that, since there was no evidence that the substance of those conversations had been relayed to the defendants, Taylor's testimony was not relevant. The Government conceded that it would not produce direct "evidence that Taylor communicated directly with anyone at E&Y regarding what was falsely stated in, or intentionally omitted from, his draft opinion," but argued that a jury could infer that "those matters necessarily would have been conveyed by Smith to one or more of the defendants." The District Court denied the defendants' motion and allowed the Government to present Taylor's testimony, while warning that the Government would be required to "connect up" the evidence.

On appeal, the defendants principally argue that by admitting Taylor's testimony, the District Court misunderstood its obligations under Federal Rule of Evidence 104(b), which governs questions of conditional relevance. Rule 104(b) provides that "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later." Fed R. Evid. 104(b). When faced with a question of conditional relevance, the district court should "examine[ ] all the evidence in the case and decide[ ] whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence." *Huddleston v. United States*, 485 U.S. 681, 690 (1988). In this case, the defendants argue that the relevance of Taylor's testimony depended upon a

preliminary "conditional fact"—that the conversations between Taylor and Smith were ultimately conveyed to the defendants. In the absence of evidence that Taylor had substantive conversations with anyone else at E&Y, or that Smith told anyone at E&Y about his conversations with Taylor, the defendants argue that the Government failed to carry its burden to prove the conditional fact by a preponderance.

Despite the Government's apparent failure to confront the Rule 104(b) analysis on appeal, we are persuaded that Taylor's testimony was admissible as direct evidence of the conspiracy. As a preliminary matter, we note that the draft opinion letter prepared by Taylor and the final opinion letter issued by Locke Liddell were substantially similar, and that some passages appeared to be copied nearly verbatim. Indeed, even the defendants acknowledge that "it was certainly reasonable to conclude that Locke Liddell had received a copy of Taylor's letter, and that it had used the letter as a starting point for its own." Thus, Taylor's testimony about the content of the draft opinion letter was independently admissible as to the circumstances manifesting the formation of the conspiracy.

Taylor's testimony about his conversations with Smith admittedly presents a closer question of conditional relevance. Taylor testified at length about the various facts about the CDS transaction that had to be omitted from the tax opinion or described in misleading terms. As the Government notes, "what is striking about Taylor's concerns is that they are precisely the same facts that the defendants, in e-mail after e-mail, cautioned people against revealing to the IRS." Based on these similarities, the District Court concluded that a reasonable jury could infer that Taylor's concerns were passed on to the defendants. In the circumstances presented here, we agree. Although the defendants protest that there is no evidence that Taylor communicated directly with the defendants, we have never required a statement to be disseminated to each member of the conspiracy in order to be admissible against the whole. *Cf. United States v. Friedman*, 854 F.2d 535, 562 (2d Cir. 1988) ("[T]here is no requirement that

49

each member of a conspiracy conspire directly with every other member of the conspiracy."). Accordingly, we affirm the District Court's decision to admit Taylor's testimony.

## V. Admission of Coconspirator Statements

Defendant Vaughn, in an argument joined by each of the trial defendants, argues that the District Court committed reversible error by admitting the out-of-court statements of more than 20 alleged coconspirators. Federal Rule of Evidence 801 provides that a statement is not hearsay if it is both offered against a party and is "made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit hearsay testimony under Rule 801(d)(2)(E), the district court "must find (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered [(the "non-offering party")], and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Alameh*, 341 F.3d 167, 176 (2d Cir. 2003) (quotation marks omitted). These are "preliminary questions of fact" to be resolved by the district court under a preponderance of the evidence standard. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

We review for clear error a district court's findings as to whether "there was a conspiracy involving the declarant and the nonoffering party, and [whether] the statement was made during the course and in furtherance of the conspiracy." *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 137 (2d Cir. 2008) (quotation marks omitted) (alteration in original). As previously noted, we review a district court's determination as to the admissibility of evidence at trial for abuse of discretion. *Williams*, 585 F.3d at 707.

Prior to trial, the Government identified 50 people as coconspirators with the defendants, including central figures such as David Smith, Peter Cinquegrani, and Belle Six. When the Government offered out-of-court statements of the alleged coconspirators at trial, the defense objected

that the Government had not carried its burden as to the elements of the coconspirator exception. The District Court admitted the evidence subject to connection under the procedure established in *Bourjaily v. United States*, 483 U.S. 171 (1987), which permits the district court to "examine the hearsay statements sought to be admitted" in "making a preliminary factual determination." *Id.* at 181. At the close of the Government's case, the defense filed a motion to strike the out-of-court statements of the alleged coconspirators. After holding oral argument on the motion and requesting copies of certain exhibits for additional review, the District Court made a blanket ruling that "the prerequisites of Rule 801(d)(2)(E) have been shown by a preponderance of the evidence with respect to each of the conditionally admitted statements."

The defendants argue on appeal that the District Court's blanket admission of the coconspirator statements transgresses the "limit[s] [on] the proper use of Rule 801(d)(2)(E) to admit coconspirator testimony." *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). Specifically, Vaughn argues that, as to most or all of the alleged coconspirators, the Government failed to prove that they had the intent to join and further an illegal venture. *See id.* at 83 ("It is the unity of interests stemming from a specific shared criminal task that justifies Rule 801(d)(2)(E) in the first place . . . ."). For example, the defendants argue that two outside accountants, Fred Goldman and Robert Cooper, were "merely outside functionaries" and "cannot be considered 'co-conspirators' with the defendants under any reasonable definition of the term."

In response, the Government accuses Vaughn of "cherry-pick[ing]" testimony to argue his case when there was "ample evidence" to establish that Goldman, Cooper, and others were coconspirators with the defendants. In particular, the Government notes that Cooper acknowledged at trial that he had given false and misleading testimony during an IRS tax audit and that he believed he was helping clients commit tax evasion when he signed tax returns for the Add-On transaction.

Upon review of the foregoing arguments, it appears that the defendants' fundamental objection to the coconspirator evidence relates to the generalized nature of the District Court's ruling. *See* Vaughn Reply 34 ("In point of fact, it is the summary fashion by which the District Court dispensed with these detailed, specific objections by the Defendants which forms the basis of Vaughn's argument concerning this point on appeal."). Although the blanket ruling by the District Court certainly makes appellate review more difficult, we have never required the district court to make particularized rulings or conduct separable analyses with respect to each coconspirator, much less each coconspirator statement. *Cf. United States v. Al-Moayad*, 545 F.3d 139, 173 (2d Cir. 2008) (vacating the judgment because "[t]he court made *no* findings, by a preponderance of the evidence or otherwise, about the existence of a conspiracy" (emphasis added)). The record makes clear that the able and experienced district judge reviewed the defendants' motion papers, held oral argument, obtained additional evidence from the Government, applied the correct legal standard, and made a considered oral ruling. In light of these facts, the District Court did not clearly err in its factual determination that the out-of-court statements were made in furtherance of the conspiracy, and therefore did not abuse its discretion by admitting the out-of-court statements under the coconspirator exception.

### VI. Exclusion of Portions of Coplan and Vaughn Deposition Transcripts

Coplan and Vaughn argue that the District Court abused its discretion by excluding from evidence portions of their deposition transcripts. As part of an IRS "promoter exam" of E&Y,[36] the IRS deposed both Coplan and Vaughn in June 2002. The deposition transcripts formed the basis for Counts Six and Seven of the Redacted Indictment, which charged Coplan and Vaughn with making false statements to the IRS. At trial, the Government sought to introduce only the portions of the deposition transcripts containing the false statements alleged in Counts Six and Seven. Coplan and

---

[36] A "promoter exam" (as opposed to an "income tax exam") aims to determine (1) whether the entity under examination is a principal or an organizer under the tax laws, and (2) whether the underlying transactions constitute tax shelters.

52

Vaughn sought to admit their entire deposition transcripts in order to demonstrate that the statements, even if false, were not material to the promoter exam. The District Court thereafter accepted certain counter-designations proposed by the defendants, but refused to admit the entire transcripts, holding that the excluded portions were "largely inadmissible hearsay offered by defendants, or they [we]re simply irrelevant to the issues here."

Once again, we review a district court's determination as to the admissibility of evidence at trial for abuse of discretion. *Williams*, 585 F.3d at 707.

## A. The Alleged Error

Coplan and Vaughn argue that, in excluding more than 80 percent of the deposition transcripts, the District Court erred by (1) ruling that the bulk of the deposition transcripts constituted hearsay; (2) failing to admit the statements under the rule of completeness; and (3) failing to admit the statements under the state of mind exception to the hearsay rule.

### 1. Hearsay

Under Federal Rule of Evidence 801, a hearsay statement is an out-of-court "assertion" that is "offer[ed] . . . to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(a) & (c); *see United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."). Here, Coplan and Vaughn challenge the District Court's predicate ruling that the bulk of the deposition transcripts were offered for the truth of the matter asserted. But as the Government tacitly concedes, *see* Gov't's Br. 232, the questions posed by the IRS agent were not hearsay, because as a matter of law, questions are not "assertions" within the meaning of Rule 801. *See United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990) ("An inquiry is not an 'assertion,' and accordingly is not and cannot be a hearsay

statement." (quotation marks omitted)). Thus, the District Court erred by invoking the hearsay rule to exclude the questions contained in the deposition transcripts.

The hearsay status of the defendants' responses presents a closer question. Coplan insists that his responses were not offered for the truth of the matter asserted, but to demonstrate "the overall purpose of the interview, the context in which the charged statements were made, and [his] willingness to cooperate fully in the interview." Coplan Reply 31 n.5. The Government counters that Coplan's true purpose was to convince the jury that, in the course of a lengthy deposition, he was mostly truthful. The Government's contention finds support in a letter brief from Coplan's counsel, which made clear that he wished to admit the entire deposition transcript in order to show "his forthcoming approach to the proceeding." SA 303. In light of these facts, the District Court did not abuse its discretion by invoking the hearsay rule to exclude the deposition responses.

### 2. "Rule of Completeness"

Under Federal Rule of Evidence 106, where a party introduces all or part of a recorded statement, an adverse party may require the introduction of any other part that "in fairness ought to be considered at the same time." Fed. R. Evid. 106. The so-called "rule of completeness" provides that "even though a statement may be hearsay, an omitted portion of the statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *United States v. Kopp*, 562 F.3d 141, 144 (2d Cir. 2009) (quotation marks omitted). The rule "does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *Id.* (quotation marks omitted).

In this case, Coplan and Vaughn argue that the District Court erred in concluding that portions of the transcript offered under Rule 106 could still be excluded under the hearsay rule. Although the

Government initially misstated the standard below, Coplan identified the mistake almost immediately, and there is no indication that the District Court misapprehended or misapplied the Rule 106 standard in electing to admit the defendants' counter-designations but not the entire transcripts. Citing the relevant standard from *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999), the District Court stated that it was "[u]sing [Rule] 106 as a filter or a polestar" in refusing to admit the deposition transcripts in their entirety, but admitting a number of counter-designations. We find no abuse of discretion in that determination.

### 3. "State of Mind" Exception

Federal Rule of Evidence Rule 803(3) provides a hearsay exception for "[a] statement of the declarant's then-existing state of mind . . . or emotional, sensory, or physical condition." Fed. R. Evid. 803(3). The defendants contend that the excluded portions of the transcript were admissible under this "state of mind" exception. In particular, Coplan argues that a statement evincing his confusion about the definition of a "digital option" should have been admitted "to show [his] lack of understanding of some of the financial instruments involved." Coplan Br. 83. But although Coplan raised Rule 803(3) "in general terms" below, it appears that his current argument—that certain statements were admissible to prove his *lack* of technical acumen—was never presented to the District Court. A III: 218/4167 (District Court ruling noting that defendants "haven't given any specificity of statements that show state of mind of Vaughn or Coplan").

### B. Prejudice

In any event, even assuming *arguendo* that the District Court erred by not admitting the entirety of the deposition transcripts, the error was harmless. Fed. R. Crim. P. 52(a) (defining "harmless error" as "[a]ny error, defect, irregularity, or variance that does not affect substantial rights"). The defendants argue that the erroneous exclusion "gutted" their defense that the false statements "were, at best,

ancillary to the investigation." Coplan Br. 85. But in the full context of the record, it is clear that the defendants had ample opportunity to make these arguments through their cross-examination of the IRS agent and their closing arguments. Moreover, the jury heard testimony explaining how all of the information sought by the IRS was material to the promoter exam that was the subject of the deposition. On this record, we conclude that, even if the exclusion of the deposition testimony was erroneous, the error was harmless. *See United States v. Farhane*, 634 F.3d 127, 164 (2d Cir. 2011) (deeming harmless the exclusion of state of mind evidence where Government's contrary evidence was "clearly overwhelming"); *United States v. Song*, 436 F.3d 137, 140 (2d Cir. 2006) (deeming harmless the erroneous exclusion of state of mind evidence where defendant "was permitted to testify in sufficient detail as to his theory of the case" and Government presented overwhelming evidence of guilt).

## VII. Alleged Prosecutorial Misconduct

Shapiro, joined by Coplan and Vaughn, argues that the Government committed prosecutorial misconduct by introducing surprise arguments and misrepresenting evidence in its rebuttal summation. Specifically, the defendants challenge (1) the Government's "surprise" arguments about client responses to the PICO IDR; and (2) the Government's description of COBRA as a "trick" and an "amazing" and "extraordinary" distortion of the relevant tax regulations.[37]

As a general matter, a defendant asserting that a prosecutor's remarks warrant a new trial "'faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial.'" *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012) (quoting *United States v. Locascio*, 6 F.3d 924, 925 (2d Cir. 1993) (alterations omitted)); *see also United States v. Whitten*, 610 F.3d 168, 202 (2d Cir. 2010) ("We will reverse on the ground of prosecutorial misconduct only if that

---

[37] Shapiro also argues that the Government's rebuttal summation mischaracterized the record by telling the jury that Dougherty had "told" them that "Mr. Shapiro lied about why the S corporation was needed" for the COBRA transaction. Because we have already concluded that Shapiro's conspiracy conviction must be reversed on sufficiency grounds, we decline to address this argument.

misconduct caused substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." (internal quotation marks omitted)). "In considering whether inappropriate remarks rise to the level of prejudicial error, we examine 'the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct.'" *United States v. Gansman*, 657 F.3d 85, 96 (2d Cir. 2011) (quoting *United States v. Caracappa*, 614 F.3d 30, 41 (2d Cir. 2010)).

With respect to the "surprise" rebuttal argument, it is well established that "[r]ebuttal provides the government with the opportunity to respond to defendant's arguments. It does not allow the government to bring in new matters." *United States v. Giovanelli*, 945 F.2d 479, 495 (2d Cir. 1991) (quotation marks omitted). In context, however, it appears that the "surprise" PICO IDR argument was briefly discussed in the Government's opening summation as "one of the most galling examples" of statements prepared by the defendants that falsely described their clients' subjective intent. The Government then returned to the PICO IDR argument in rebuttal, highlighting the fact that none of the defense counsel had addressed the PICO IDR responses. Returning to an argument noted— although not emphasized—by the Government in its opening summation cannot be regarded as "deceitful and unfair." Shapiro Br. 83. In the context of a rebuttal summation that spanned some 120 pages of trial transcript, any misconduct here cannot be deemed severe. *See United States v. Newton*, 369 F.3d 659, 681 (2d Cir. 2004) (cautioning against "disproportionate emphasis [on] isolated incidents of alleged error").

The defendants also challenge the Government's description of the COBRA transaction as a "trick" and an "amazing" and "extraordinary" distortion of the relevant tax regulations. This argument is equally unpersuasive. It is well established that the Government "has broad latitude in the inferences it may reasonably suggest to the jury during summation." *United States v. Edwards*, 342 F.3d 168, 181 (2d

Cir. 2003) (quotation mark omitted). In this case, the Government had presented ample evidence to support the inference that COBRA—a shelter that, rather than deferring or converting taxes, eliminated tax liability altogether—was based on an aggressive, although not necessarily unlawful, interpretation of the tax code. *See, e.g.*, A II: 364/2149 (testimony of Belle Six) ("We did look at elimination strategies in [the VIPER Group]. The consensus was not that we wouldn't sell them, but that it would be very unlikely that Ernst & Young would ever reach a level of authority to sell them."). The Government's comments about COBRA in rebuttal summation, "while arguably imprecise, were by no means unreasonable in light of the evidence presented at trial and the nature of the charged . . . scheme." *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005). For that reason, we find the defendants' assertions of prosecutorial misconduct to be without merit.

## VIII. Jury Instructions

Coplan, Shapiro, and Nissenbaum argue that the District Court's jury instructions were flawed in three respects: (1) the instructions on Count One, the conspiracy to defraud charge, unfairly emphasized the Government's theory of the case and omitted their theory of defense; (2) there was no factual basis for the conscious avoidance instruction in connection with Counts Two and Three, the tax evasion charges; and (3) the instructions on Counts Two and Three contained an improper definition of "economic substance."

As a general matter, we review a properly preserved claim of error regarding jury instructions *de novo*, reversing only where, "viewing the charge as a whole, there was a prejudicial error." *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003). The trial court "enjoys broad discretion in crafting its instructions[,] which is only circumscribed by the requirement that the charge be fair to both sides." *United States v. Brand*, 467 F.3d 179, 205 (2d Cir. 2006) (quotation marks omitted). A defendant challenging a district court's refusal to give a requested jury instruction carries the "heavy burden . . . .

[of showing] that his proposed charge accurately represented the law in every respect, and that the charge actually given, viewed as a whole, prejudiced him." *United States v. Feliciano*, 223 F.3d 102, 116 (2d Cir. 2000) (internal quotation marks omitted).

## A. Instructions on the Defense Theory

First, the defendants argue that the jury instructions on Count One omitted their theory of defense and unfairly emphasized the Government's theory of guilt. Although a defendant is "entitled to have the court charge the jury on any defense theory for which a foundation existed in the record, he [is] not necessarily entitled to have that instruction communicated to the jury in the language of his choice." *Brand*, 467 F.3d at 205 (quotation marks omitted) (alteration in original). "We will vacate a conviction on account of a missing requested instruction if (1) the requested instruction was legally correct; (2) it represents a theory of defense with basis in the record that would lead to acquittal; and (3) the theory is not effectively presented elsewhere in the charge." *United States v. Prawl*, 168 F.3d 622, 626 (2d Cir. 1999) (internal quotation marks omitted).

In this case, the defendants proposed a jury instruction on Count One that emphasized the distinction between acts that made the IRS's job more difficult and acts that were done deceitfully or dishonestly. Their requested instruction included a number of examples that, in the defendants' view, could not constitute a conspiracy to defraud, in order to advance the defense theory that their conduct was legitimate advocacy on behalf of their clients. *See, e.g.*, A VI: 262 (proposed jury instruction) ("It is not illegal simply to make the IRS's job harder. This is particularly true for the defendants, whose professional obligations as attorneys or certified public accountants required them to represent the interests of their clients vigorously in their dealings with adversaries, such as the IRS."). The District Court adopted the substance of the proposed charge, but declined to include the defendants' examples

or to inform the jury about the special obligations of tax professionals who represent clients in an adversarial setting.[38]

We affirm the District Court's ruling primarily because the defendants' proposed charge did not "accurately represent[ ] the law in every respect." *Feliciano*, 223 F.3d at 116 (quotation marks omitted). The examples of purportedly lawful conduct proffered by the defendants included the following: "an agreement between witnesses not to tell the government something unless specifically asked about it;

---

[38] With respect to the conspiracy to defraud charge, the District Court instructed the jury as follows:

> A conspiracy to defraud the United States does not necessarily involve cheating the government out of money or property. The statute also includes conspiracies to interfere with or obstruct any lawful government function by fraud, deceit, or any dishonest means. I instruct you that the IRS is an agency of the United States government. The term "conspiracy to defraud the United States" therefore means that the defendants and their alleged co-conspirators are accused of conspiring to impede, impair, obstruct or defeat, by fraudulent or dishonest means, the lawful functions of the IRS to ascertain taxes and to collect lawfully due and owing tax revenue.

> Only conduct that both is intended to impede the lawful functions of a government agency and is fraudulent or dishonest will support a charge of conspiracy to defraud a government agency. A conspiracy to impede the functions of a government agency by fraudulent or dishonest means may include such things as altering documents after they have been demanded by the government agency, creating false documents, destroying records, making false statements, attempting to induce others to make false statements, or engaging in any other fraudulent or deceptive conduct that would have the effect of impairing the ability of the government agency to determine material aspects of a transaction. By giving you these examples, ladies and gentlemen, I do not mean to suggest that these are the only actions that could impede the IRS by fraudulent or dishonest means, nor am I expressing any view as to whether conduct similar to these examples actually took place here. That's for you to decide.

> Not all conduct that impedes the lawful functions of a government agency is illegal. To be unlawful, that conduct has to entail fraud, deceit, or other dishonest means. *It is not illegal simply to make the IRS's job harder. Only an agreement to engage in conduct that tends to impede the IRS, and also involves fraudulent, deceitful or dishonest means, constitutes an illegal agreement to defraud the United States.*

> It is not necessary that the government or the IRS actually suffer a financial loss from a scheme. A conspiracy to defraud exists when there is an agreement to impede, impair, obstruct, or defeat, in any fraudulent or dishonest manner, the lawful functions of the IRS. One cannot use deception or dishonest means to impede, impair, defeat, or obstruct the IRS, even to protect a legitimate tax position.

> Where, however, there is an agreement to impede, impair, obstruct, or defeat the lawful functions of the IRS by fraudulent, deceptive, or dishonest means, the first element is satisfied regardless of whether the means of doing so in that particular instance are or are not unlawful in and of themselves.

> That's the first object that's alleged here, defrauding the IRS and the United States.

A VI: 419/6157–59 (emphasis added).

advice from an attorney to a client to assert his constitutional right not to speak to government investigators; an agreement not to create a document that individuals had no obligation to create." A VI: 262. Although these acts are not necessarily deceitful, no bright line rule excludes such acts from supporting a conspiracy to defraud. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707 (1962) ("[I]t is well settled that acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme."). We are not unsympathetic to the defendants' view that a lay jury may struggle to fully apprehend the obligations of tax professionals zealously (and lawfully) representing clients before the IRS. Nevertheless, because the current understanding of the *Klein* doctrine does not categorically exclude the foregoing acts, the District Court properly omitted the proposed examples from the jury instructions.

In any event, the Court's actual instructions on Count One repeatedly emphasized the need for the jury to find that the defendants acted in a deceitful or dishonest manner in order to convict. A VI: 419/6158 ("Only conduct that both is intended to impede the lawful functions of a government agency and is fraudulent or dishonest will support a charge of conspiracy to defraud a government agency. . . . Not all conduct that impedes the lawful functions of a government agency is illegal. To be unlawful, that conduct has to entail fraud, deceit, or other dishonest means."). "[V]iewing the charge as a whole," we find no prejudicial error. *Aina-Marshall*, 336 F.3d at 170.

### B. Conscious Avoidance Instruction

The defendants further argue that there was no factual basis for the conscious avoidance instruction in connection with Counts Two and Three, the tax evasion charges. "'A conscious avoidance instruction permits a jury to find that a defendant had culpable knowledge of a fact when the evidence shows that the defendant intentionally avoided confirming the fact.'" *United States v. Quinones*,

61

635 F.3d 590, 594 (2d Cir. 2011) (quoting *United States v. Ferrarini,* 219 F.3d 145, 154 (2d Cir. 2000)).[39]

A conscious avoidance instruction is appropriate only when (1) "a defendant asserts the lack of some specific aspect of knowledge required for conviction," and (2) "the appropriate factual predicate for the charge exists, *i.e.*, the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011) (quotation marks omitted). The Government need not choose between an "actual knowledge" and a "conscious avoidance" theory. *United States v. Kaplan*, 490 F.3d 110, 128 n.7 (2d Cir. 2007).

In this case, the Government requested a conscious avoidance instruction in connection with the scienter element of Counts Two and Three, the tax evasion charges. The defense objected that there was no factual predicate for the conscious avoidance instruction; the District Court overruled the objection, finding unspecified "adequate evidence" to support the charge. The jury was instructed that the knowledge element would be satisfied if a defendant "was aware of a high probability that a CDS add-on shelter transaction lacked a reasonable possibility of a profit" and "acted with a conscious purpose to avoid learning the truth about whether or not the shelter had a reasonable possibility of a profit."

With respect to Coplan, we conclude that the conscious avoidance instruction was clearly justified. In February 2001, Coplan reviewed and commented on a spreadsheet he received from Belle Six that listed the Add-On clients and provided basic information about each client. That spreadsheet reflected the cost of the client's investment and the maximum potential payout ratio for the investment—two of three data points necessary to evaluate profit potential. Specifically, the

---

[39] We have recently noted that "[t]he Supreme Court appears to now prefer the appellation 'willful blindness.'" *United States v. Ferguson*, 676 F.3d 260, 278 n.16 (2d Cir. 2011) (quoting *Global–Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 & n.9 (2011)). Because the parties used the term "conscious avoidance" below, we continue to use that term for purposes of this case.

spreadsheet showed that the investment for each taxpayer cost approximately 0.5% of the desired tax loss, and that the maximum payout ratio for each taxpayer was approximately 2:1 (profit to premium). *See* note 25, *ante* (describing the 2:1 payoff ratio). From these two variables, it was apparent that Add-On lacked profit potential if the fees exceeded 1.0%. Given Coplan's role as the head of SISG and his involvement in setting the Add-On fees, there was sufficient evidence to allow the jury to conclude that, if Coplan did not have actual knowledge that the fees exceeded 1.0%, he "*decided* not to learn th[at] key fact," *Rodriguez*, 983 F.2d at 458. For that reason, we conclude that the conscious avoidance instruction was appropriate with respect to Coplan.

The factual basis for the conscious avoidance instruction as to Shapiro and Nissenbaum presents a much closer question. Because we are reversing Counts Two and Three with respect to Shapiro and Nissenbaum based on the insufficiency of the evidence, *see* Part II.B, *ante*, we need not, and do not, reach their challenges to the conscious avoidance instruction.

### C. Economic Substance Instruction

Finally, the defendants also argue that the instructions on Counts Two and Three contained an improper definition of "economic substance." The District Court instructed the jury that the Add-On transaction lacked "economic substance" if (1) the transaction offered "no reasonable possibility that the transaction would result in a profit," and (2) the relevant taxpayer had "no business purpose" for engaging in the transaction.[40] The defendants challenge the "no reasonable possibility that the

---

[40] With respect to the economic substance test, the District Court instructed the jury as follows:

> In order to establish that a transaction lacks economic substance, the government must prove two elements beyond a reasonable doubt: The first element is that there was no reasonable possibility that the transaction would result in a profit. The second element is that the relevant taxpayer had no business purpose for engaging in the transaction in question apart from the creation of the tax deduction.
>
> . . . .
>
> Now, let me say a few words about your determination as to whether or not there was a reasonable possibility that the shelter would result in a profit. This element requires you to reach an

transaction would result in a profit" language in the first element of the instruction, arguing instead a transaction lacks economic substance only where there is "no market risk."

As a general matter, a transaction that lacks economic substance will not provide the basis for a tax deduction. *Ferguson v. Comm'r*, 29 F.3d 98, 101 (2d Cir. 1994). A transaction lacks economic substance if it "can not [sic] with reason be said to have purpose, substance, or utility apart from [its] anticipated tax consequences." *Lee v. Comm'r*, 155 F.3d 584, 586 (2d Cir. 1998) (quotation mark omitted); *see also Jacobson v. Comm'r*, 915 F.2d 832, 837 (2d Cir. 1990) ("A sham transaction analysis requires a determination whether the transaction has any practicable economic effects other than the creation of income tax losses." (internal quotation marks omitted)).

The law of economic substance, it must be said, is not a model of clarity. The economic substance doctrine was, "if not formulated, then at least popularized" by Judge Learned Hand's opinion in *Helvering v. Gregory*, 69 F.2d 809 (2d Cir. 1934), *aff'd*, *Gregory v. Helvering*, 293 U.S. 465 (1935). David P. Hariton, *Sorting Out the Tangle of Economic Substance*, 52 Tax Law. 235, 241 (1999). Since *Gregory*, the economic substance doctrine "has been applied differently from circuit to circuit and sometimes inconsistently within circuits." *Modern Tax Controversies*, 957 Practicing Law Inst. at 478-35 (summarizing the "disjunctive, conjunctive, and unitary formulations" of the economic substance doctrine).[41]

---

objective judgment about whether the government has proved that there was no reasonable possibility that the shelter would result in a profit. In other words, this does not depend upon what the taxpayer believed about the profit potential. It requires you to consider all of the evidence and reach a conclusion about whether the government has proved beyond a reasonable doubt that there was no reasonable possibility of a profit on the tax shelter after the fees and other costs were paid. If you find that the government has proved beyond a reasonable doubt that there was no reasonable possibility of a profit, then you move on to the second element, whether the relevant taxpayer had no business purpose for engaging in the tax shelter. If you find that the government has not proved the lack of a reasonable possibility of a profit, then you must reject the government's theory and find the defendants not guilty.

A VI: 424/6176–77 (paragraph breaks omitted).

[41] In 2010, Congress finally codified the economic substance doctrine at 26 U.S.C. § 7701(o). The codified version applies prospectively to transactions entered into after March 30, 2010, and is therefore inapplicable to this case.

Our Circuit is no exception. In *United States v. Atkins*, we approved an instruction that a transaction lacks economic substance if it was subject to "no market risk." 869 F.2d 135, 140 (2d Cir. 1989) (upholding a charge that the transaction at issue lacked economic substance if (1) it was "not intended either to make or preserve any profit or to limit a loss in any way," and (2) it was subject to no market risk in that "changes in market prices cannot have any effect" (quotation marks omitted)). In *United States v. Regan*, 937 F.2d 823, 827 (2d Cir. 1991), we suggested, without expressly ruling, that a "no market risk" instruction was erroneous on the particular facts of that case. Most recently, in a non-precedential disposition, we approved an instruction that a transaction lacks economic substance when there is "no reasonable possibility that the transaction would result in a profit." *United States v. Pfaff*, 407 F. App'x 506, 508 (2d Cir. 2010) (quotation marks omitted). In so holding, we noted that the "narrower definition" we previously approved did not "state the outer limits of the economic substance doctrine." *Id.*

Despite these inconsistencies, we return to the premise that a transaction lacks economic substance if it "can not [sic] *with reason* be said to have purpose, substance, or utility apart from [its] anticipated tax consequences." *Lee*, 155 F.3d at 586 (emphasis added). Given the presence of the reasonableness standard in our early formulations of the economic substance doctrine, we now hold that the District Court's "no reasonable possibility that the transaction would result in a profit" instruction, *see* note 40, *ante*, accurately stated the law.

### IX. "Spillover" Prejudice

Coplan argues that, should his conviction on Counts One, Two, Three, or Seven be overturned, this Court would be obligated to vacate Count Five (obstruction of the IRS), based on "spillover prejudice." Because we affirm Coplan's conviction in its entirety, we reject this argument. Vaughn

likewise argues that the allegedly improper venue on Count Six and the admission of the coconspirator statements caused prejudicial spillover.  We reject this argument, as we rejected its predicates.

## X. Procedural and Substantive Reasonableness of Bolton's Sentence

Finally, Bolton challenges the procedural and substantive reasonableness of his 15-month sentence.  As previously noted, Bolton pleaded guilty to a Superseding Information charging him in one count of conspiracy, in violation of 18 U.S.C. § 371, with three objectives: (1) a *Klein* conspiracy; (2) making false statements to the IRS; and (3) obstruction of the IRS.  On appeal, Bolton contends that (1) the District Court erred in concluding that his conviction under § 371 resulted in a "tax loss" within the meaning of the Guidelines; (2) his sentence of 15 months of imprisonment was substantively unreasonable; and (3) the $3 million fine imposed by the District Court should be vacated in light of *United States v. Pfaff*, 619 F.3d 172 (2d Cir. 2010).

We review a criminal sentence for "reasonableness," which "amounts to review for abuse of discretion."  *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (*en banc*).  "Reasonableness review requires an examination of the length of the sentence (substantive reasonableness) as well as the procedure employed in arriving at the sentence (procedural reasonableness)."  *United States v. Johnson*, 567 F.3d 40, 51 (2d Cir. 2009).  A district court commits procedural error where it fails to calculate (or improperly calculates) the Guidelines range, treats the Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails to adequately explain the chosen sentence. *Gall v. United States*, 552 U.S. 38, 51 (2007).  We have previously likened our review for substantive unreasonableness "to the consideration of a motion for a new criminal jury trial, which should be granted only when the jury's verdict was 'manifestly unjust,' and to the determination of intentional torts by state actors, which should be found only if the alleged tort 'shocks the conscience.'"

*United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010) (quoting *United States v. Rigas*, 583 F.3d 108, 122–23 (2d Cir. 2009)).

## A. Sentencing Proceedings

The parties—the Government and Bolton, in this context—stipulated in the plea agreement that "under the special facts of this case applicable to the defendant, there is no 'tax loss' as defined in § 2T1.1(c) of the Sentencing Guidelines." Bolton A. 36. It was further stipulated that Bolton's advisory Guidelines range would be 0 to 6 months of imprisonment if the Court applied U.S.S.G. § 2T1.9, or 10 to 16 months of imprisonment if the Court applied U.S.S.G. § 2J1.2. The Pre-Sentence Report of the U.S. Probation Office calculated an advisory Guidelines range of 0 to 6 months of imprisonment under § 2T1.9 and recommended a sentence of 6 months of imprisonment. In its sentencing submission, the Government agreed with the Probation Office that the applicable Guidelines range was 0 to 6 months, but urged the Court to impose a sentence above that range based on the factors set forth in 18 U.S.C. § 3553(a).

By order dated January 29, 2010, Judge Stein ordered counsel to appear at a hearing in order to discuss "several issues" related to Bolton's Guidelines calculation. At that hearing, Judge Stein explained that he had a "huge problem" with the parties' stipulation that no tax loss was attributable to Bolton under the Guidelines. Specifically, Judge Stein stated that he could not be "intellectually honest" and adopt the position that there was no tax loss attributable to Bolton in light of his (Judge Stein's) conclusion that the tax loss attributable to the trial defendants exceeded $400 million. At the April 13, 2010 sentencing hearing, Judge Stein applied § 2T1.1(a) and calculated an advisory Guidelines range of 210 to 262 months of imprisonment based on an estimated tax loss in excess of $400 million. He then imposed a sentence of 15 months of imprisonment, noting that "if my finding on loss is

incorrect, the sentence would still be the same because this is a substantial, massive departure." Bolton A 117.

## B. Procedural Unreasonableness

Bolton argues on appeal that the District Court committed procedural error by applying § 2T1.1(a) even though he was not convicted of tax evasion. In essence, Bolton contends that a "tax loss" within the meaning of the Guidelines exists only where a defendant willfully evaded taxes or committed certain other "specific intent" crimes.

The Guideline applicable to § 371 conspiracy convictions is § 2T1.9,[42] which states that a defendant's base offense level shall be the greater of 10 or the offense level determined from § 2T1.1 or § 2T1.4, as appropriate. Section 2T1.1 is entitled "Tax Evasion; Willful Failure to File Return, Supply Information, or Pay Tax; Fraudulent or False Returns, Statements, or Other Documents."[43] Section 2T1.4 is entitled "Aiding, Assisting, Procuring, Counseling, or Advising Tax Fraud."[44] Under either provision, the base offense level is determined by calculating the "tax loss" for the offense.

---

[42] Section 2T1.9 provides, in relevant part:

> Conspiracy to Impede, Impair, Obstruct, or Defeat Tax
> (a)    Base Offense Level (Apply the greater):
>       (1)    Offense level determined from § 2T1.1 or § 2T1.4, as appropriate; or
>       (2)    **10**.

U.S.S.G. § 2T1.9(a).

[43] Section 2T1.1 provides, in relevant part:

> Tax Evasion; Willful Failure to File Return, Supply Information, or Pay Tax; Fraudulent or False Returns, Statements, or Other Documents
> (a)    Base Offense Level:
>       (1)    Level from § 2T4.1 (Tax Table) corresponding to the tax loss; or
>       (2)    **6**, if there is no tax loss.

U.S.S.G. § 2T1.1(a).

[44] Section 2T1.4 provides, in relevant part:

> Aiding, Assisting, Procuring, Counseling, or Advising Tax Fraud
> (a)    Base Offense Level:
>       (1)    Level from § 2T4.1 (Tax Table) corresponding to the tax loss; or

Pursuant to § 2T1.1(c)(1), a "tax loss" is defined as follows:

If the offense involved tax evasion or a fraudulent or false return, statement or other document, the tax loss is the total amount of loss that was the object of the offense (*i.e.*, the loss that would have resulted had the offense been successfully completed).

U.S.S.G. § 2T1.1(c)(1). The definition measures tax loss by reference to "the object of the offense." But nothing in the definition limits the existence of a "tax loss" to instances where a defendant acted willfully or otherwise intended to cause a loss to the IRS. Thus, although the title of the provision makes clear that § 2T1.1 is focused on tax evasion and other willful violations of the tax laws, nothing in the language limits the application of § 2T1.1 to such crimes.[45] Assuming *arguendo* that the District Court *did* err in applying § 2T1.1, that error would be harmless because the District Court stated explicitly that it would impose the same sentence regardless of the loss amount. *See United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009) ("Where we identify procedural error in a sentence, but the record indicates clearly that the district court would have imposed the same sentence in any event, the error may be deemed harmless, avoiding the need to vacate the sentence and to remand the case for sentencing." (internal quotation marks omitted)). Bolton attempts to minimize the significance of the District Court's statements by characterizing them as "cursory" observations "near the close of Mr. Bolton's sentencing." But nothing about the sentencing below was "cursory." Although the Court determined that the applicable Guidelines range was 210 to 262 months of imprisonment, it ultimately imposed a sentence of 15 months—a 93% reduction from the low end of that range. Inasmuch as Bolton's sentence clearly was not driven by the initial Guidelines calculation, the Court's statement that

---

(2)      **6**, if there is no tax loss.
For purposes of this guideline, the "tax loss" is the tax loss, as defined in § 2T1.1, resulting from the defendant's aid, assistance, procurance or advice.
U.S.S.G. § 2T1.1(a).

[45] We note, however, our considerable skepticism about the *wisdom* of applying an intended rather than actual loss measure where, as here, the defendant has not been convicted of a crime requiring him to have the specific intent to cause a tax loss.

it would impose the same sentence even in the absence of a tax loss is amply supported by the record. For that reason, we can "confidently conclude" that any arguable error here was harmless. *Id.*

## C. Substantive Unreasonableness

Bolton also argues that his 15-month sentence was substantively unreasonable because the District Court "unreasonably weighted the seriousness of [his] offense based on the evidence, particularly in comparison to the E&Y defendants."[46] Bolton Br. 28. But given the fact that Bolton played a significant and necessary role in the conspiracy (by coming up with the Add-On cover story and signing IRS documents, for example), as well as his significant financial gain in implementing the transactions, it cannot be said that his 15-month sentence was "manifestly unjust." *See Rigas*, 583 F.3d at 122.

## D. Fine Imposed on Bolton

Finally, Bolton argues—and the Government agrees—that the $3 million fine imposed by the District Court should be vacated in light of *United States v. Pfaff*, 619 F.3d 172 (2d Cir. 2010), which was decided four months after Bolton's sentencing. In *Pfaff*, we held that, in the absence of a jury finding, a district court may not impose a fine greater than the default statutory maximums provided by 18 U.S.C. § 3571(d). *Id.* at 175 ("[I]t is the clear implication of *Apprendi* and *Blakely* that when a jury does not make a pecuniary gain or loss finding, § 3571's default statutory maximums cap the amount a district court may fine the defendant."). Further, in the time period between the sentencing hearing in this case and the filing of this opinion, the Supreme Court decided *Southern Union Co. v. United States*, squarely holding that "the rule of *Apprendi* applies to the imposition of criminal fines." 132 S. Ct. 2344, 2357 (2012) (Sotomayor, J.).

---

[46] The sentences of the trial defendants were as follows: Robert Coplan (36 months), Martin Nissenbaum (30 months), Richard Shapiro (28 months), Brian Vaughn (20 months).

It is indisputable that the District Court could not impose a fine in excess of the statutory maximum of $250,000. *See* 18 U.S.C. § 3571(b)(3). Accordingly, we vacate the portion of Bolton's sentence that imposed the fine, and remand the cause to the District Court for the sole purpose of reducing the fine to the statutory maximum of $250,000.

## CONCLUSION

The District Court presided over this complex and difficult case with admirable care and understanding of its intricacies.

To summarize, we hold that:

(1)    The defendants' challenge to the so-called *Klein* conspiracy theory of criminal liability under 18 U.S.C. § 371 fails under the law of the Circuit, which remains good law absent review or modification by the Supreme Court;

(2)    With respect to the sufficiency challenges:

    a.    The convictions of Shapiro and Nissenbaum on Count One, charging conspiracy in violation of 18 U.S.C. § 371, are **REVERSED** due to insufficient evidence;

    b.    The convictions of Shapiro and Nissenbaum on Counts Two and Three, charging tax evasion in violation of 26 U.S.C. § 7201, are **REVERSED** due to insufficient evidence;

    c.    Nissenbaum's conviction on Count Four, charging him with obstruction of the IRS in violation of 26 U.S.C. § 7212, is **REVERSED** due to insufficient evidence;

(3)    Venue was proper with respect to Count Six, which charged Vaughn with false statements to the IRS in violation of 18 U.S.C. § 1001;

(4)    The District Court did not err by admitting the testimony of Graham Taylor;

71

(5) The District Court did not err by admitting the out-of-court statements of the alleged coconspirators;

(6) The District Court did not err by excluding portions of Coplan's and Vaughn's deposition transcripts;

(7) There was no prosecutorial misconduct in the Government's rebuttal summation;

(8) The District Court did not err by:

    a. declining to give a "theory of the defense" instruction;

    b. including a conscious avoidance instruction; or

    c. instructing the jury that "economic substance" existed only if there was a "reasonable possibility" of profit;

(9) Spillover prejudice did not infect the remaining convictions; and

(10) The portion of Bolton's sentence imposing a fine is **VACATED** and the cause is **REMANDED** for the sole purpose of reducing the fine to the statutory maximum of $250,000.

In light of these holdings, the judgments of conviction of Coplan and Vaughn are **AFFIRMED**, the judgments of conviction of Shapiro and Nissenbaum are **REVERSED**, and the portion of Bolton's sentence imposing a $3 million fine **VACATED** and the cause is **REMANDED** for the sole purpose of reducing the fine to the statutory maximum of $250,000. Judgment with respect to defendants Shapiro and Nissenbaum shall enter on all counts as to which we have reversed the judgment of the District Court.

# APPENDIX A

*United States v. Robert Coplan, Martin Nissenbaum, Richard Shapiro & Brian Vaughn*
07 Cr. 453 (SHS)
Redacted Indictment
[*Source*: A. 90-143.]

| Count | Title | Statute | Defendants |
|---|---|---|---|
| Count 1 | Conspiracy<br><br>Objectives:<br>*Klein* conspiracy;<br>Tax Evasion;<br>False Statements | 18 U.S.C. § 371 | Coplan, Nissenbaum, Shapiro, Vaughn |
| Count 2 | Tax Evasion<br>[Client: LaRocque] | 26 U.S.C. § 7201;<br>18 U.S.C. § 2 | Coplan, Nissenbaum, Shapiro, Vaughn |
| Count 3 | Tax Evasion<br>[Client: Cornerstone] | 26 U.S.C. § 7201;<br>18 U.S.C. § 2 | Coplan, Nissenbaum, Shapiro, Vaughn |
| Count 4 | Obstruction of the IRS | 26 U.S.C. § 7212 | Nissenbaum |
| Count 5 | Obstruction of the IRS | 26 U.S.C. § 7212 | Coplan |
| Count 6 | False Statements to the IRS | 18 U.S.C. § 1001 | Vaughn |
| Count 7 | False Statements to the IRS | 18 U.S.C. § 1001 | Coplan |

*United States v. Charles Bolton*
07 Cr. 453 (SHS)
Superseding Information
[*Source*: Bolton A. 28-34.]

| Count | Title | Statute | Defendant |
|---|---|---|---|
| Count 1 | Conspiracy | 18 U.S.C. § 371 | Bolton |

73

## APPENDIX B

## RELEVANT STATUTORY PROVISIONS

### 18 U.S.C. § 371—Conspiracy to Commit Offense or to Defraud United States

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

### 26 U.S.C. § 7201—Attempt to Evade or Defeat Tax

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

### 26 U.S.C. § 7212—Attempts to Interfere with Administration of Internal Revenue Laws

(a)  Corrupt or forcible interference

Whoever corruptly or by force or threats of force (including any threatening letter or communication) endeavors to intimidate or impede any officer or employee of the United States acting in an official capacity under this title, or in any other way corruptly or by force or threats of force (including any threatening letter or communication) obstructs or impedes, or endeavors to obstruct or impede, the due administration of this title, shall, upon conviction thereof, be fined not more than $5,000, or imprisoned not more than 3 years, or both, except that if the offense is committed only by threats of force, the person convicted thereof shall be fined not more than $3,000, or imprisoned not more than 1 year, or both. The term "threats of force", as used in this subsection, means threats of bodily harm to the officer or employee of the United States or to a member of his family.

(b) Forcible rescue of seized property

Any person who forcibly rescues or causes to be rescued any property after it shall have been seized under this title, or shall attempt or endeavor so to do, shall, excepting in cases otherwise provided for, for every such offense, be fined not more than $500, or not more than double the value of the property so rescued, whichever is the greater, or be imprisoned not more than 2 years.

**18 U.S.C. § 1001—Statements or Entries Generally**

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
(2) makes any materially false, fictitious, or fraudulent statement or representation; or
(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

(b) Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.

(c) With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to—

(1) administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or
(2) any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate.

USA v. Coplan, No.
10-0583-cr(L)

KEARSE, Circuit Judge, dissenting in part:

I respectfully dissent from so much of the Majority Opinion as finds the evidence insufficient to support (1) the convictions of defendants Richard Shapiro and Martin Nissenbaum of conspiracy, in violation of 18 U.S.C. § 371, to (a) defraud the United States by impairing the lawful functions of an agency of the United States government, to wit, the Internal Revenue Service ("IRS"), (b) commit tax evasion, see 26 U.S.C. § 7201, and (c) make false statements to the IRS, see 18 U.S.C. § 1001 (Count One); and (2) those two defendants' convictions of attempted tax evasion in violation of 26 U.S.C. § 7201 (Counts Two and Three).

As the Majority Opinion sets out, this prosecution focused principally on

> the design, implementation, and audit defense of four tax shelters developed by the [Ernst & Young  LLP ("E&Y")] VIPER Group/SISG:  the (1) Contingent Deferred Swap ("CDS"); (2) Currency Options Bring Reward Alternatives ("COBRA"); (3) CDS Add-On ("Add-On"); and (4) Personal Investment Corporation ("PICO") shelters.

Majority Opinion ante at 4.  "The IRS can disallow deductions resulting from a transaction that 'can not [sic] with reason be said to have purpose, substance, or utility apart from [its] anticipated tax consequences.  Such transactions are said to lack "economic substance."'"  Majority Opinion ante at 10 n.15 (quoting, with alterations, Lee v. Commissioner, 155 F.3d 584, 586 (2d Cir. 1998)).

Count One of the superseding indictment alleged that each of the above four tax shelters, along with one other, was fraudulent, and that Shapiro, Nissenbaum, and defendant Robert Coplan--each of whom was a lawyer with a Master's Degree in tax law and decades of experience in tax practice--and other persons known and unknown, conspired and agreed to defraud the United States, to violate the federal income tax laws, and to make false statements to the IRS. As the Majority Opinion acknowledges, the evidence as to the conspiracy's objectives is not deficient if there is sufficient evidence of at least one of the alleged objectives. See Majority Opinion ante at 18. "[T]he Government sought to demonstrate that the defendants hid the truth from the IRS by withholding information and making affirmative misstatements" about these shelters, Majority Opinion ante at 10, in IRS audit interviews and in connection with a 2000 IRS amnesty program that would allow a person who had invested in tax shelters, if the IRS deemed them not legitimate transactions, to avoid paying penalties on those transactions.

The Majority does not suggest that there was insufficient evidence for the jury to find that there existed a conspiracy with one or more of the objectives alleged in Count One. Nor could it, given that Coplan and defendant Brian Vaughn, a certified public accountant and certified financial planner employed by E&Y, were convicted of participating in the alleged conspiracy and that we affirm those convictions. Rather, the Majority finds that the evidence was insufficient to show that Shapiro and Nissenbaum knew of the conspiracy and participated in it. See Majority Opinion ante at 18-19.

The Majority Opinion sets out the well established legal principles that "[i]n the context of a conspiracy conviction, 'deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a

2

conspiracy can be laid bare in court,'" Majority Opinion ante at 18 (quoting United States v. Rojas, 617 F.3d 669, 674 (2d Cir. 2010)); that "'the government is entitled to prove its case solely through circumstantial evidence,'" Majority Opinion ante at 29 (quoting United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir. 2004)); and that "[i]n evaluating a sufficiency challenge, we 'must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'" Majority Opinion ante at 17 (quoting United States v. Chavez, 549 F.3d 119, 124-25 (2d Cir. 2008)). But in finding the evidence insufficient to permit the jury to infer that Shapiro and Nissenbaum knew of the conspiracy and participated in it, the Majority does not apply these principles.

A. The Conspiracy Count

E&Y, an accounting firm, had a Personal Financial Counseling group ("PFC") that included a group, initially called VIPER--an acronym for Value Ideas Produce Extraordinary Results-- and whose name was later changed to Strategic Individual Solutions Group ("SISG") (see Government Exhibit ("GX") 73), which marketed tax shelters (see Trial Transcript ("Tr."), 4619, 1069). Coplan was the leader of this "high net worth market group" (Tr. 4619-20); Shapiro and Nissenbaum were core members (see, e.g., id. at 2135-37, 2236).

At trial, the government introduced numerous e-mails between or among Shapiro, Nissenbaum, and Coplan (and others) discussing, inter alia, the need to prevent certain materials, which mentioned E&Y clients' interest in minimizing or eliminating taxes, from falling into the hands of the IRS. These included:

3

- GX 795 (Coplan e-mail dated November 27, 2000, with copies to Shapiro, among others, stating, "we refrain from sending out--or leaving with a client--promotional materials that go through the steps of a strategy, or even highlight the tax benefits of a strategy. Business purpose is a critical element to prove for these solutions, and the less evidence there is that the client responded to a tax-saving promotion, the better for his argument that there were non-tax motivations guiding his actions." (emphasis added));

- GX 860 (Shapiro e-mail dated May 22, 2001, to Melinda Merk, a member of the PFC group who worked with SISG (see Tr. 1281), stating that "as a general rule, presentation materials SHOULD NOT be left with the client. Clients may take notes, etc., but materials should be handed back at the end of the meeting. In an audit meeting i [sic] had in Minneapolis on a COBRA transaction, one of the items requested of the taxpayer was any promotional materials that they had.");

- GX 795 (Merk e-mail dated November 22, 2000, to an E&Y tax department employee stating "I am hesitant to prepare and provide any summary for delivery to a potential client, based on my recent conversations with Richard Shapiro and Bob Coplan that we be very careful about providing such information in writing for potential dissemination into the marketplace and/or receipt by the media, Treasury . . . ." (emphases added));

- GX 555 (Coplan e-mail dated July 17, 2001, to some 60 E&Y employees, including Shapiro and Nissenbaum, "instruct[ing them] to immediately delete and dispose of any and all materials in [their] drawers and on [their] computers related to the COBRA transaction other than" opinion letters and documents related to the client's currency trades and "documents supporting the economic purpose and bona fide nature of the investment in the transaction" (emphases added));

- GX 602 (Coplan e-mail dated July 23, 2001, to some 60 E&Y employees, including Shapiro and Nissenbaum, re "PICO Materials Leak," stating that a potential client had sent a set of E&Y's PICO materials to an E&Y competitor, and that although Coplan was "not suggesting that this is necessarily a calamitous event[, t]he potential negative repercussions are obvious, and a fax of the materials to certain people [including] the government WOULD have calamitous results" (emphasis added)); and

-  GX 639 (Coplan e-mail dated June 14, 2000, to an E&Y regional senior manager, with a copy to Shapiro re "Final Set of CDS Add-On Slides," stating, inter alia, that "[i]f these slides ever made their way to the IRS . . . the entire business purpose argument that gives us the ability to distinguish this from COBRA would be out the window." (emphases added)).

As discussed below in subparts 1-4 and Part B below, the government also presented testimony from many witnesses, including

- former E&Y tax partner Thomas A. Dougherty, who testified that, in the presence of Shapiro and others, he lied to the IRS in connection with the COBRA tax shelter, making false but "plausible" representations that he had discussed with Shapiro;

- former E&Y client Kathryn Munro, who testified to statements made--and statements not made--to her by E&Y in connection with investments in CDS and Add-On shelters, and with respect to false and misleading amnesty letters prepared by E&Y for submission to the IRS;

- former E&Y manager Jason Bryant Rydberg, who dealt with Munro and testified to, inter alia, the preparation of false and misleading opinion letters and letters to the IRS following its offer of amnesty with regard to CDS and Add-On tax shelters, and testified to the E&Y requirement that presentations with regard to those shelters be shown in advance to Shapiro;

- former E&Y manager Belle Six--who earned a total of some $22 million in commissions both from selling CDS shelters while at E&Y working with, among others, Shapiro, Coplan, and Nissenbaum, and from selling E&Y Add-On shelters thereafter--who had pleaded guilty to conspiring to defraud the government and had been required to pay or forfeit that total to the government (see Tr. 2106-10); and

- former practicing lawyer Peter Cinquegrani, who had pleaded guilty to, inter alia, conspiring with others to give false statements and false documents to the IRS in connection with the PICO tax shelter, having collaborated with Shapiro in fashioning PICO opinion letters that Cinquegrani testified he knew contained false and misleading statements constituting a "cover story" (Tr. 4015).

1. Shapiro and COBRA

Shapiro was the E&Y leader on the national roll-out presentation of the COBRA tax shelter in 1999. (See Tr. 4588.) Dougherty testified principally about the professed--and purported-- interests of three members of a partnership called WRB Lake who invested in a COBRA tax shelter. Dougherty had been instructed by E&Y's tax division director to ask two of those partners--E&Y clients Bill Wanner and Brian Sullivan, whose business was water purification and desalinization and

5

who were selling a company at a profit of more than $20 million each--whether they were interested in E&Y's CDS strategy (see id. at 1081-86) to convert their ordinary income, which would have been taxable at about a 40% rate, into long-term capital gains, which would be taxable at 20% (see generally id. at 2149). However, Wanner and Sullivan, along with another WRB Lake partner, informed Dougherty that they were interested instead in a strategy whereby taxes on their transaction would be not just minimized but "eliminate[d]." (Id. at 1087.) After E&Y decided to market COBRA, its tax elimination strategy (see id. at 1088-89), the WRB Lake partners sought "to enter into a COBRA transaction . . . for the purpose of eliminating tax on the transaction they were going through"; the clients said they "w[ere] interested in pursuing [COBRA] for that purpose" (id. at 1183), and in 1999 they did so. From the outset, Wanner had stated his "desire to enter into the COBRA transaction for purposes of creating a tax loss." (Id. at 1141.)

In mid-March 2001, Sullivan received notice from the IRS that the WRB Lake partnership was being audited. He so informed Dougherty, who in turn informed Coplan by e-mail and fax, which Coplan forwarded to, among others, Shapiro, Nissenbaum, and Denis Conlon (see Tr. 1171-75), a member of E&Y's national tax practice whose specialty was responding to contacts from the IRS (see GX 540; Tr. 1175-76). In a conference call in early April, Dougherty discussed with Coplan and Conlon the "facts that could hurt the client's [sic] case" (Tr. 1186). Dougherty, Coplan, and Conlon "tr[ied] to . . . come up with some ideas that may be presented to the [IRS] agent for why the[]" WRB Lake partners entered the COBRA transaction (id. at 1182 (emphases added)), even though Dougherty, Coplan, and Conlon "knew that this was a COBRA transaction, one all three principals had entered into . . . to realize the tax savings" (id. at 1181). Dougherty testified:

> At this point of the discussion, we're looking at other reasons that the taxpayers came together for the purposes of why did they purchase foreign digital

6

contracts, why did they do this together in a partnership, and why did they decide to terminate that partnership and not do any more foreign currency investing.

(Id.) Dougherty advanced various possible explanations, including that Wanner had had some prior experience, in his business, of doing some foreign currency trading, and "maybe that was something we could throw out as being the fact supporting a reason for entering into this transaction" (id. at 1182 (emphasis added)), although Wanner had not indicated to Dougherty any such motivation (see id. at 1181-83). Dougherty "also talked about the fact that the three [WRB Lake partners] happened to be joint investors in [a] newly formed company," which could explain why "they would be willing to form a partnership together and carry on some partnership investment activities. Maybe that would be something we could use." (Id. at 1182 (emphasis added).) Dougherty had already told Coplan and Conlon "the real history behind these clients; that is, how they came to Ernst & Young and the COBRA transaction." (Id. at 1736.) "They knew those facts about the three clients." (Id. at 1738.) "We were talking about plausible reasons that could be presented"; "we needed to come up with some business reasons why the transaction took place in the form it took place." (Id. at 1740 (emphases added).)

After that conference call among Dougherty, Coplan, and Conlon, Conlon sent Dougherty and Coplan an e-mail dated April 19, 2001, stating that they needed to have Shapiro join the thinking (see GX 542 ("I think we need Richard . . . . I want to state our case clearly and correctly from the beginning . . . . IRS would like to catch us cold and get admissions that will hurt our case. We need to make sure that does not happen.")). Accordingly, on April 20, 2001, Coplan e-mailed Dougherty, Conlon, and Shapiro to schedule a conference "call with all of us . . . to go over the facts of this case and plan how we will approach the agents on this matter." (Tr. 1188.)

7

In late April, a conference call was held among Dougherty, Coplan, Conlon, and Shapiro. During that call, Shapiro raised the question of business purpose (see Tr. 1741-42), saying "[w]e need to discuss business purpose on this transaction" (id. at 1191). Dougherty, however, "[h]ad" already "told Mr. Shapiro at that point the real facts about how these clients had come to Ernst & Young for the COBRA transaction." (Id. at 1741 (emphasis added).) The reason Dougherty, Coplan, Conlon, and Shapiro were "discussing business purpose" was the "same reason" that Dougherty, Coplan, and Conlon had discussed possible business purposes in their earlier call: they needed "to talk about the other reasons, plausible reasons, that could be discussed . . . should it become important to discuss that at the meeting with the agent." (Id. (emphases added).)

Dougherty testified that in the ensuing May 17, 2001 IRS interview, attended by Dougherty, Conlon, and Shapiro, Dougherty "lied" to the IRS agent "about why the three [WRB Lake partners] got into the COBRA transactions." (Tr. 1743.) Dougherty gave the agent "the plausible reasons that we had talked about during the discussions, which were misleading the agent as to the real purpose." (Id. at 1743-44 (emphases added).) Dougherty testified that the "[s]tatements [he] made to the agent about why the clients had done this, were . . . things [he] had gone over during the calls with Mr. Coplan, Mr. Conlon, and Mr. Shapiro." (Id. at 1743 (emphasis added).)

From this series of events alone, the jury could permissibly find that, with respect to COBRA, Shapiro knowingly joined and participated in the conspiracy with Coplan and others to impair the lawful functions of the IRS and to make false statements to the IRS.

2. Shapiro and CDS and CDS Add-On

In addition, Shapiro was E&Y's "subject matter expert"--or "SME"--on its CDS strategy (Tr. 4555), which would convert high ordinary income into long-term capital gains (taxable at about half the rate of such ordinary income), and on the Add-On strategy (see GX 636), which, when used in the second year of a CDS transaction, would involve the creation and liquidation of an LLC and eliminate even the capital gains. The SME had the "technical expertise" (Tr. 4876), i.e., he "was the person that knew the transaction the best and that's who you went to for the questions" (id. at 4555) and "for approval" (id.). For example, a regional senior manager sent an e-mail to Shapiro forwarding a Power Point presentation to Shapiro "for approval as the CDS SME." (GX 30, dated October 22, 1999.) And in response to a Power Point presentation proposed by Vaughn for Add-On, Coplan stated that "the Add-On strategy will lose all of its 'business purpose' if it is reduced to steps in a PowerPoint slide. The tax objective will appear to be the driving force" (GX 636 (Coplan e-mail dated June 14, 2000, to Vaughn, with a copy to Shapiro)); Coplan recommended not using slides and recommended that all "materials like this" should be reviewed in advance by Shapiro, as the Add-On "SME" (id.).

Success of the CDS shelter--involving a partnership that was to engage in swap transactions purportedly having a term of 18 months--depended on the swap's termination after one year but short of the 18-month stated termination date. One year was the dividing line between short-term capital gains and long-term capital gains; termination prior to the end of the stated 18-month term was required for gains to be treated as capital gains rather than ordinary income. (See, e.g., Tr. 2198-99.) Shapiro repeatedly urged that the fact that early termination was pre-planned not be disclosed. On February 8, 2000, he sent an e-mail to Merk, with copies to Nissenbaum, Coplan, and

9

Vaughn, on "the [CDS] action plan"; in addition to suggesting that he, Shapiro, along with Coplan or Vaughn, should be involved in any CDS sales contact, Shapiro noted "the fact that our swap will be terminated early"--and noted that this was "[c]learly . . . necessary for the flow of the transaction"--and he "question[ed] . . . seriously" whether there "should . . . be a document in existence . . . that has all chapters and verses laid out." (GX 66 (emphases added).) Shapiro added that "[t]he fact that no materials are to be left behind at a sales call is not enough. In my opinion, before anything is in 'stone' here, we should consider what are [sic] record will/should look like." (Id. (emphasis added).) And in an e-mail to Vaughn about "cds models," with copies to Nissenbaum, Coplan, and others, Shapiro instructed that certain "deletions" from the model documents were "essential," and that the statements that "'Calculations assume utilization of the Early Termination Provision . . .' should be deleted." (GX 100, dated April 14, 2000.)

Bolton Capital Planning ("Bolton" or "BCP") was the general partner in some LLPs created for CDS shelters. (See, e.g., Tr. 2215-16, 2477; GX 1231.) After Bolton received an inquiry from the IRS with regard to a CDS shelter, Coplan revised the language of the initial draft of the BCP response to the IRS inquiry to state that "[i]f the general partner, based on market fluctuations, terminates the swap contracts early, capital gain would arise on such termination" (GX 412 (Coplan e-mail dated January 18, 2001 (emphasis added))). Six testified that this "does not" (Tr. 2321) "accurately describe what . . . clients" were "told . . . about early termination and how the decision was made to early terminate" the CDS swaps (id. at 2320). The decision was not to be made based on market fluctuations; the "understanding" was "[t]hat we assumed we would terminate, early terminate . . . if the counterparty did not." (Id. at 2321 (emphases added).) The revised language in GX 412 had been introduced the previous day in an e-mail from Coplan to Shapiro, Nissenbaum, and others, with

10

the statement that "This one should be more acceptable to Richard." (GX 932, dated January 17, 2001; see Tr. 2318-22.)

Consistent with Shapiro's observation that "early" termination was necessary for success of the CDS strategy but should not be so described, former E&Y client Munro testified that when she and her husband had invested in a CDS shelter, they were not told that the swap had a duration of 18 months. They were simply told it would last a year. (See Tr. 3548; see also id. at 4564 (Rydberg testifying that "the maturity date of the swap that[ was] used in the CDS transaction" was 18 months; "[w]e told [clients] it would last 12 months and a day to the early termination date"); id. at 4537 ("all the CDS transactions ha[d] the same . . . early termination date" of "12 months and one day").)

Munro also testified that the "purpose of [the Munros' CDS] transaction was to defer [their] tax liability until [they] sold" shares that her husband had received from the exercise of stock options "and could pay the capital gains tax." (Tr. 3539; see also id. at 3525, 3530-32.) In 1999 with respect to CDS and in 2001 with respect to Add-On, Rydberg sent the Munros "representation letter[s]" to sign and return in order to receive opinions from a law firm as to the legitimacy of their investments in CDS and Add-On. (Id. at 3519-24, 4637-38.) Munro testified that these were letters that she did "[n]ot really" read before signing (id. at 3524), having "paid a lot of money to Ernst & Young for tax advice" (id. at 3526; see, e.g., id. at 4581 (Rydberg testifying that he told clients "the fee[] for th[e CDS] transaction . . . was 4 percent of the loss that was being generated"); id. at 3512 (the Munros, for their CDS transaction, paid E&Y $400,000)). Munro testified that the representation letters were false and misleading in that they misstated the purpose for which she and her husband had invested in CDS and Add-On; and the opinion letters received by the Munros--who did not deal with the opining law firm except through E&Y--repeated those misstatements. (See id. at 3524-41.)

11

Munro testified that, contrary to the E&Y-drafted representation letters, "[w]e did not invest in [the partnership] as a sound financial investment. We invested in it so we could pay less in taxes. That was the basic purpose of the transaction." (Tr. 3525.) Contrary to the representation letters, "[i]t wasn't a sound coherent business strategy. It was a specific transaction to help us reduce our taxes"; nobody "from Ernst & Young talk[ed] to [Munro] about a coherent business philosophy in connection with the CDS transaction." (Id.) Contrary to the opinion letters--which were based on the representation letters--the CDS in fact "had a predetermined outcome . . . and the outcome was the conversion of ordinary income to capital gains income. And that's what the purpose of the transaction was about." (Id. at 3530-31.) Contrary to the opinion letters, the partnership formed by Munro and her husband for the CDS had no "overall business plan"; "[t]he plan of the partnership was to convert ordinary income that you had by exercising your options and convert it to capital gain. So pay less in taxes was the primary purpose of the partnership." (Id. at 3531-32.)

In 2002, Rydberg informed Munro of the IRS's amnesty program, and E&Y drafted amnesty letters for Munro and her husband with respect to CDS and Add-On, which were signed by the Munros and were submitted to the IRS. (See Tr. 3545-46, 3550.) Munro testified that those amnesty letters--which were based on the opinion letters and (a) described business purposes that the Munros did not have, (b) did not mention the Munros' purpose of reducing taxes, and (c) stated that the letters did not omit any material facts (see id. at 3546 (describing GX 1231 as pertaining to CDS and GX 1232 as pertaining to Add-On))--were false and misleading (see Tr. 3544-50).

The Munros' amnesty letters to the IRS, submitted in March 2002, had been drafted by Rydberg. Rydberg testified that his draft for Add-On followed a template received from Coplan. (See, e.g., Tr. 4657-58; GX 491.) Drafts of that template had been e-mailed by Coplan to, among others, Shapiro and Nissenbaum on February 27, 2002 (see GX 490), and on March 5, 2002 (see

12

GX 491). In the latter e-mail, Coplan stated "Please look this over to see if there are any changes you would make either to avoid unnecessary facts or to make it easier to complete accurately. I want to post this and distribute this morning. I will be sending along the CDS template later this morning . . . ." (Id.) Nissenbaum responded to Coplan, with a copy to Shapiro, that, other than believing details as to the specific option trades to be unnecessary, "[t]he disclosure looks fine to me" (id.; see Tr. 4663); and Shapiro provided some nonsubstantive comments that were adopted (see Tr. 4663-65; compare GX 491 with GX 492). But "[t]hroughout these various drafts of the generic add-on amnesty template, . . . the basic description of the transaction remain[ed] the same" (id. at 4665); and those drafts omitted mention of tax-minimization or tax-elimination purposes (see GX 490, 491).

Although the Add-On strategy for CDS was the brainchild of Vaughn (see Tr. 2378-79), Add-On was in reality a combination of CDS and COBRA (see id. at 1378-81). Both of the latter were shelters promoted to E&Y by Shapiro (see id. at 2144-46 (CDS); id. at 4588 (COBRA)), and Shapiro was the SME for Add-On (see GX 636). Vaughn, in a June 9, 2000 e-mail to numerous E&Y tax department employees, with copies to Shapiro, Coplan, and Nissenbaum, noted that "[w]ith the add-on feature, CDS can now be applied to capital gain situations," and stated that "the 1999 and 2000 clients that have completed a CDS transaction" would shortly be "notif[ied] . . . of the opportunity to participate in the new trading program." (GX 633.) Shapiro responded: "i [sic] remain concerned of the formal pre-wired tie-in to cobra. i [sic] think it adversely impacts the story that we can tell regarding the purpose of the transaction." (Id. (emphasis added).) Coplan then edited the letter to be sent to clients announcing Add-On and, in an e-mail dated July 1, 2000, to Shapiro, Vaughn, Six, Merk, and Nissenbaum, stated, "I softened the last reference to the liquidation of the interest in the LLC so it sounds less like an event that we know will happen in the near future." (GX 144 (emphases added).) However, LLC liquidation was part of the eighth of 13 specified steps

13

that were necessary for the success of an Add-On transaction. (See GX 115 (Vaughn e-mail dated May 18, 2000, to Coplan and Shapiro).) As Six testified, "liquidation of the interest in the LLC" in fact "was one of the steps that was required to obtain the tax benefits." (Tr. 2410.)

### 3. Shapiro and PICO

The PICO (or Personal Investment Corporation) tax shelter was a tax deferral and conversion strategy that involved investments in an S corporation, called PICO, by the taxpayer and another shareholder. The PICO would engage in straddle transactions that generated offsetting gains and losses, with only the losses allocated to the taxpayer. These capital losses could be used by the taxpayer to offset his capital gains from unrelated sources. (See Tr. 3736.)

Cinquegrani, in early 2000, was an attorney who was approached, for an opinion letter, by the person who had conceived of PICO and who instructed Cinquegrani to contact Richard Shapiro, E&Y's lead contact for PICO. (See Tr. 3739-42.) In Cinquegrani's initial conversation with Shapiro, there was no discussion of any business purpose or non-tax reason for PICO. (See id. at 3743-44.)

Cinquegrani proceeded to have legal issues researched, and he kept Shapiro informed of the results. (See, e.g., Tr. 3748-49.) He had many conversations with Shapiro, "discuss[ing] various provisions of the Internal Revenue Code that may apply to the transaction, and [Shapiro] asked about what issues were or were not being included in the opinion" (id. at 3773); and Cinquegrani sent memoranda and drafts to Shapiro, who forwarded them to Coplan and Nissenbaum (see id. at 3751-54, 3769-70). Cinquegrani sent summaries of the conclusions to be included in the requested opinion letter, and drafts of proposed fact sections--based on "assumed" facts, as there were no PICO clients at the time (id. at 3752-53)--to support the already-reached legal conclusions (see id.

14

at 3750-54; id. at 3761 ("by the time [Cinquegrani] drafted [this] facts section," the PICO opinion letter "was largely in its final form").)

After receiving Cinquegrani's draft of the fact section, Shapiro sent Cinquegrani an e-mail listing economic-substance representations that had been made in connection with a different transaction, stating that he was sending them for discussion purposes "as to tone, etc., **not** specifically for content." (GX 653 (Shapiro e-mail dated August 7, 2000 (bold in original)).) Shapiro's first four sample representations referred to "substantial non-tax" business purposes for the transaction; and the last stated that "[i]nvestor has reviewed the description of the transactions contained in the Letter and such description is accurate and complete, and there are no pertinent facts relating to the Transactions that have not been set forth in such description"; but Shapiro's samples said nothing about the transaction's tax ramifications. (Id.) Cinquegrani testified that he added some of Shapiro's sample representations to the ensuing version of the PICO opinion (see Tr. 3777); the substance of two Shapiro samples asserting non-tax business purposes appeared as client representations in Cinquegrani's opinion letter (see, e.g., GX 663).

Cinquegrani testified that he knew he was drafting a document that was misleading as to the true purpose of the PICO transaction and that he was engaged in wrongdoing. (See Tr. 3761.) For example, the fact description began by stating that the LLC "is offering qualified investors ('the investors') the opportunity to create a special purpose investment management company to capitalize on [the LLC's] expertise in the foreign exchange markets and general investment management services"; Cinquegrani testified that that was not an accurate statement because "the real reason for offering this vehicle, which is the PICO, is to provide tax losses for investors." (Id. at 3754-56.) The description contained other false or misleading statements as well (see id. at 3756-61), because although PICO was designed "[t]o make available to the investor significant losses" (id. at 3758),

15

Cinquegrani's "intention was to describe the transaction as much as possible as an ordinary business deal and to downplay all the tax aspects" (id. at 3756), "deemphasizing wherever possible tax benefits" (id. at 3760). No one at E&Y expressed any concerns about the language of the letter. (See id. at 3761.)

In sum, Cinquegrani testified that there was a "cover story element to the beginning of the opinion that misleads about what the transaction is all about" (Tr. 4015) and that the opinion letter contained statements that were false and misleading (see id. at 3754-81), indeed, "wildly misleading" (id. at 3779). Cinquegrani was asked why he did not tell "Shapiro" and others that the opinion letter contained a false cover story. (Id. at 4021.) Cinquegrani testified that he "didn't feel a need to say, oh, by the way, the stuff we are writing doesn't really reflect what's really going on," because "the key players, that you mentioned, Mr. Shapiro [and others], they all participated in creating the story." (Tr. 4021-22.)

4. Nissenbaum

Nissenbaum too was a core member of the SISG Group headed by Coplan. (See Tr. 2135-37, 2236.) I disagree with the Majority's view that the evidence was insufficient to permit a reasonable inference that Nissenbaum knew of and participated in the conspiracy to impede the IRS in the performance of its lawful functions.

As the above discussion of Shapiro reveals, Nissenbaum too received numerous e-mails from Coplan, as well as several from Shapiro, urging concealment of facts that were material to the tax-minimization or tax-elimination goals of the COBRA, CDS, Add-On, and PICO shelters.

16

These included:

- Coplan's July 17, 2001 e-mail, GX 555, ordering retention of documents "supporting the economic purpose and bona fide nature of the investment in the [COBRA] transaction" (emphasis added), along with legal opinions and documents relating to the currency trades, but ordering the immediate deletion and disposition of any other materials related to COBRA;

- Coplan's July 23, 2001 e-mail, GX 602, about a "PICO Materials Leak," stressing that leaking "of the materials to . . . the government WOULD have calamitous results";

- Shapiro's February 8, 2000 e-mail on CDS, GX 66, "seriously" "question[ing]" whether the "[c]learly . . . necessary" "fact that our swap will be terminated early" should be included in "a document";

- Shapiro's April 14, 2000 e-mail on CDS, GX 100, terming it "essential" that the statements that "'Calculations assume utilization of the Early Termination Provision'" "be deleted" from the model documents;

- Coplan's July 1, 2000 e-mail, GX 144, stating--despite the fact that liquidation of the interest in the LLC was in fact a step that was required in order to achieve the planned tax benefits--that Coplan had "softened the" Add-On announcement letters' "reference to the liquidation of the interest in the LLC so it sounds less like an event that we know will happen in the near future."

I see nothing that required the jury to regard Nissenbaum as a disinterested recipient of random e-mails. These were communications sent to him as a core member of the SISG group, which prepared presentations, prepared templates for letters to and for clients, and prepared templates for responses to IRS inquiries. Plainly Nissenbaum did review e-mails sent to him with regard to letters to be sent to the IRS in seeking amnesty. With regard to PICO, Dougherty testified that he prepared a disclosure letter using an "amnesty template . . . coming from Mr. Nissenbaum" (Tr. 1761; see id. at 1317-18); and that template did not "disclos[e] all the [taxpayer's] motives" for entering into the transaction (id. at 1762) and did not "mention the primary motivation of deferring and reducing taxes" (id. at 1761). Nissenbaum approved the letter (prepared from his template) without substantive change as "Good to go" (GX 583 (Nissenbaum e-mail dated April 18, 2002); see also Tr. 1641). With

17

regard to Add-On, Coplan solicited--and received--comments from Nissenbaum on the proposed amnesty template (which adopted misstatements in the opinion letters received by E&Y clients, the opinion letters, in turn, having been prepared from the form representation letters for the clients (see, e.g., GX 786 (e-mail dated March 30, 2001, from Brent Clifton, attorney who wrote Add-On opinion letters, to Shapiro, Coplan, and Nissenbaum); Tr. 2486-88)). The amnesty letter templates did not disclose the taxpayer's actual motive, i.e., tax-elimination. Nissenbaum's only suggestion was to eliminate some investment details; otherwise, he said, "[t]he disclosure looks fine to me" (GX 491 (Nissenbaum e-mail dated March 5, 2002, to Coplan and Shapiro); see Tr. 4663).

Nor can it reasonably be argued that Nissenbaum did not realize the import of any of these nondisclosures. In March 2000, when he became aware that a regional E&Y tax department employee had sent to some 18 other tax department employees a Power Point presentation describing an SISG tax shelter, Nissenbaum instructed the director of that region to "make it clear" that "**nothing** from SISG is to be circulated this widely" (GX 94 (Nissenbaum e-mail dated March 22, 2000 (emphasis in original))). Nissenbaum stated, "This could shut this down sooner than sending the PowerPoint to the IRS!" (Id.)

B. The Convictions of Shapiro and Nissenbaum on Counts Two and Three

Counts Two and Three of the superseding indictment charged Shapiro and Nissenbaum with substantive offenses, to wit, attempted tax evasion in violation of 26 U.S.C. § 7201 in connection with the Add-On tax shelter. Section 7201 prohibits "any conduct, the likely effect of which would be to mislead or to conceal," Spies v. United States, 317 U.S. 492, 499 (1943). The jury was instructed, inter alia, that it could find defendants guilty of these substantive offenses on the basis of the principle established in Pinkerton v. United States, 328 U.S. 640 (1946), that when the evidence

18

establishes that a conspiracy existed, a member of the conspiracy may be held liable for all acts of wrongdoing performed by other coconspirators during the course of and in furtherance of the conspiracy, see id. at 646-47.

Coplan and Vaughn were convicted of the conspiracy alleged in Count One and of the substantive tax evasion offenses alleged in Counts Two and Three. Given the evidence that supports the convictions of Shapiro and Nissenbaum of the Count One conspiracy, discussed in Part A above, the jury could easily find that the tax evasions by Coplan and Vaughn were in furtherance of the conspiracy and were foreseeable to Shapiro and Nissenbaum. I would thus uphold the verdicts against Shapiro and Nissenbaum on Counts Two and Three on the Pinkerton theory.

The Majority rejects the applicability of the Pinkerton theory "[f]or substantially the reasons that" the Majority would reverse the convictions of Shapiro and Nissenbaum for conspiracy, Majority Opinion ante at 32-34. That is, the Majority views the evidence as insufficient to permit the inference that Shapiro and Nissenbaum knew of and participated in the Count One conspiracy, i.e., that they were in fact members of the conspiracy.

In my view, the evidence discussed in Part A above was ample to permit the jury to infer that Shapiro and Nissenbaum knew of and participated in the proven conspiracy. Each was a core member of SISG, the tax-shelter-marketing arm of E&Y; they received numerous e-mails, principally from Coplan, cautioning against allowing E&Y materials marketing those shelters to fall into the hands of "the IRS." And similar warnings were explicitly issued by Shapiro and Nissenbaum themselves. The numerous warnings and stated goal to maintain sanitized files need not themselves have been unlawful in order to show, as they did, that Shapiro and Nissenbaum were fully aware of the efforts to conceal the tax purposes of these shelters from the IRS. And the evidence was sufficient to permit the jury to infer that Shapiro and Nissenbaum engaged in misleading conduct that was

19

plainly unlawful. Shapiro, for example, not only discussed with Dougherty false statements that they could proffer to the IRS in connection with the audit of the WRB Lake partners but also attended the IRS interview at which Dougherty told such "lie[s]." And both Shapiro and Nissenbaum reviewed and approved form letters to be submitted by E&Y clients to the IRS, in support of amnesty, that proffered business purposes, did not disclose the tax-reduction or tax-elimination motivation, and stated that no pertinent facts were undisclosed. In sum, I conclude that the evidence was sufficient to support the convictions of Shapiro and Nissenbaum of conspiracy as charged in Count One and of the substantive offenses charged in Counts Two and Three.